**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CHARLES E. SHAW,

      Defendant - Appellant.

No. 13-3050

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:12-CR-20044-CM-1)**

Michael M. Jackson, Topeka, Kansas, for Defendant - Appellant.

Terra Morehead, Assistant United States Attorney, (Barry R. Grissom, United States Attorney, and Leon Patton, Assistant United States Attorney, with her on the brief), Kansas City, Kansas for Plaintiff – Appellee.

Before **KELLY**, **BALDOCK**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Charles Shaw was convicted in the United States District Court for the District of Kansas of robbing a bank and two credit unions, attempting to commit a second robbery at one of the credit unions, and committing four related firearms offenses. He was acquitted on a charge of robbing a second bank. On appeal he raises four challenges to his convictions: (1) the jury could not be impartial because it learned of an improper gesture he made to a member of the jury panel during jury selection; (2) the district court erred in admitting a confession of a codefendant who had been convicted at an earlier trial; (3) the court also erred in admitting evidence of an uncharged bank robbery; and (4) the court at sentencing, rather than the jury, found that he had been previously convicted of a firearms offense. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The district court did not abuse its discretion in seating the jury because there was insufficient evidence of juror bias and the cause of any prejudice to Defendant was his own misconduct during jury selection; any error in the admission of evidence was harmless; and his challenge to his sentence is foreclosed by precedent.

I.      THE OFFENSES

The charges in the indictment against Defendant arose out of four robberies and an attempted robbery: (1) the robbery of the Kaw Valley State Bank in Topeka, Kansas, on October 19, 2010; (2) the robbery of the Main Street Credit Union in Leavenworth, Kansas, on November 24, 2010; (3) the robbery of the Citizens National Bank in Leavenworth on February 14, 2011; (4) the robbery of the Educational Credit Union in Topeka on December 30, 2011; and (5) the attempted robbery of the same Educational

2

Credit Union on February 9, 2012. Defendant was acquitted of the first robbery but convicted on eight counts arising out of the other offenses. We set forth the evidence relating to the robberies and the attempted robbery.

Because the principal issue concerning the four robberies is whether the evidence identified Defendant as one of the perpetrators, it is useful to begin with some undisputed facts about him. Defendant is a black man who was in his early 50s at the time of the robberies. He had a prior criminal record and was released from prison to the Grossman Halfway House (the Halfway House) in Leavenworth on July 17, 2009. He remained there until July 10, 2010. When he left prison he had a gold tooth, but he no longer had one when he was arrested after the attempted robbery in February 2012. His half-brother bought him a black 1990 Honda Accord during his time at the Halfway House. Upon his release from that facility, Defendant moved in with his mother in Kansas City, Missouri. On September 7, 2011, between the third and fourth robberies, Defendant bought a second car, a BMW, for $6,900 in cash, although he had been employed only sporadically since leaving the Halfway House.

Defendant had several cell phones. Among those he had at the Halfway House was one with a number ending in 6483. That phone was active until January 2011, a period including the first two robberies. A second phone in Defendant's name was found in his Accord after the attempted robbery. Its number ended in 9859 and was active from August 1, 2011, until it was found, a period covering the fourth robbery as well as the attempted robbery. The government offered testimony by FBI Agent John Hauger, who

3

had been trained in cell-phone tracking, regarding the cell towers being used by the two phones near the times of the robberies.

Evidence at trial also came from two acquaintances, if not confederates, of Defendant. Traimaine Beadles lived at the Halfway House from June 2010 until shortly after the first robbery, a period that overlapped for a short time with Defendant's stay there. After that robbery an informant identified Beadles as one of the robbers. When interviewed by FBI Agent Scott Gentine, he confessed to the robbery. He later went to trial[1], but a jury convicted him. Although he did not testify at Defendant's trial, his redacted confession was offered at the trial through Gentine's testimony.

The other acquaintance was Ronnie Rudisill, a white man. He met Defendant after Defendant's release from the Halfway House. To obtain leniency for his own offenses, he approached the United States Attorney and the FBI to provide information about several robberies, including the second and third robberies for which Defendant was indicted.

The first robbery was the one on which the jury returned a not-guilty verdict. Shortly after 2 p.m. on October 19, 2010, two men robbed the Kaw Valley State Bank in Topeka. A black male wearing a mask entered the bank, jumped two gates that led to the teller booths, and took money from two tellers. One teller described the robber as being in his mid-twenties; other witnesses testified that they could not tell his age. The second

---

[1] His defense was apparently coercion by Defendant.

robber stayed by the door throughout the robbery. Both men left the bank running. The manager of a nearby business testified that on his way back from lunch between 11 a.m. and noon he had seen a black or dark blue 1990 to 1993 Honda Accord parked behind a salon near the bank.

As noted earlier, Traimaine Beadles confessed to participating in the robbery and was convicted at a separate trial. Agent Gentine testified about Beadles's confession, but without providing the name of Beadles's confederate. Beadles stated that he had been blackmailed into robbing the bank by someone who had lived at the Halfway House before the robbery. The other man picked him up in a gray Honda in Kansas City, Missouri, and drove him to Topeka to rob the bank. Beadles stayed by the door while the other man collected the money. After the robbery the other man dropped him off at a store near the Halfway House.

Agent Hauger testified that the day before the robbery and in the early morning on the day of the robbery, there were several calls between Defendant's phone and Beadles's phone. He also testified about his findings regarding the location of cell phone 6483 on the day of the robbery. According to Hauger, he could approximate where a phone was when it had been used by determining what cell-phone tower had picked up the service. Almost all towers have three faces, which cover different sectors (each one a pie-shaped piece covering a third of a circle); and records of the cell-phone company report the tower and sector for each call. On the day of the robbery Defendant's phone was in Kansas City, Missouri, at 8:09 a.m. and in Topeka by 10:54 a.m., about three hours

5

before the robbery. The next call was at 4:43 p.m., when the phone was in southern Kansas City, Missouri. Defense counsel elicited testimony that it is at least a 47-minute drive to that part of Kansas City from the Halfway House, yet Beadles had checked into the Halfway House at 5:05 p.m., more than an hour after Defendant could have dropped him off. The government did not theorize why it took Beadles so long to check in.

The second robbery was of the Main Street Credit Union of Leavenworth at about 11:30 a.m. on November 24, 2010. Two witnesses testified, and a surveillance video confirmed, that the robber's face was covered and he wore a hooded sweatshirt with numerous Kansas City Royal (KC) logos. Officers of the Leavenworth Police Department responding to the robbery in their canine-unit truck saw a black Honda Accord rapidly leaving the area of the robbery. They observed in the vehicle an older black male with a black-and-white hooded sweatshirt with KC logos on it. They did not stop the car, however, because they had received a report that the robber was a younger black male wearing a red-and-black hooded sweatshirt and was in a larger white vehicle. But they did record the vehicle's license-plate number and later determined that it belonged to Defendant.

Using the 6483 cell-phone number, Agent Hauger testified about the phone's location around the time of the robbery. The cell phone was near the bank at 11:30 a.m. the day before the robbery (no more than 1.5 miles away) and the next day about 45 minutes before the robbery (no more than 3.5 miles away). About 8:30 a.m. on the morning of the robbery, the phone had been near the home of Defendant's mother in

6

Kansas City, Missouri (no more than 2.5 miles away). And by early afternoon it was back in Kansas City.

Also testifying about the second robbery was Defendant's acquaintance Ronnie Rudisill. Although he had not believed Defendant at the time (thinking that Defendant was just bragging), Defendant had told him before the third robbery that he had robbed the Main Street Credit Union in November, wore a KC hooded sweatshirt during the robbery, and had nearly been pulled over by police officers in a canine-unit truck. FBI Agent John Bauer testified that FBI agents did not know of Defendant's interaction with the Leavenworth police until Rudisill told them.

To discredit Rudisill by suggesting that he been involved in the November robbery, defense counsel pointed to testimony that the day before the robbery a black male (not a member of the credit union) arrived in a black Lincoln, the type of car occasionally driven by Rudisill, and exchanged a $100 bill for twenties—an unusual transaction for a nonmember. Also, to show that Rudisill could have learned how the robber was dressed from a source other than Defendant, defense counsel elicited that photographs and a brief description of the robber had been publicized after the robbery.

Defendant also elicited testimony that at the credit union during the robbery there had been a suspicious vehicle that did not look like Defendant's black Accord: One witness saw a baby-blue car go through the credit union's drive-through just before the robbery. And the credit union manager testified on cross-examination that he saw a blue Buick pull into a vacant building across the street from the bank entrance. He thought the

7

robber came from the car, although he did not see the robber get out of the car and the robber did not walk in the direction of the car when he left the credit union.

The third robbery was at the Citizen's National Bank in Leavenworth on February 14, 2011. A witness testified that the robber entered the bank wearing a hooded sweatshirt, a hat, and distinctive jeans with jewels or designs on the back pockets. She thought the robber had a gold or silver tooth. Another witness said that the robber's jacket had embroidered designs and the pants were "kind of flashy," with designs around the back pockets. R., Vol. 2 pt. 2 at 661.

Rudisill testified that the jeans were his. He described the jeans as white and red, with gems on them, and a design "[o]n the sides of the pants and towards the back and down on the back pockets." *Id.* pt. 3 at 1042. The FBI had retrieved the jeans from his girlfriend and they were admitted into evidence at trial. Rudisill explained that on the day of the robbery Defendant had borrowed his clothes, including the jeans, which Rudisill identified as the clothes worn by the robber in bank surveillance photos. Rudisill also identified Defendant as the robber in the photos. White stitching on the jeans in the center of the crotch was not visible in the photos, but Agent Bauer testified that the stitching could not be seen because the robber was leaning to the side and the pants were too big for Defendant.

Rudisill further testified that on the day of the robbery Defendant drove him to the bank and asked him to exchange five twenties for a $100 bill. When he returned, Defendant casually asked him whether there was a guard and how many people were in

8

the bank. Later that day Rudisill heard sirens and learned that the bank had been robbed. When Rudisill confronted Defendant, Defendant admitted being the robber and gave Rudisill about $1,000.

Agent Hauger did not provide cell-phone evidence for the robbery, because no known cell phone of Defendant's was active at the time.

The first of the indicted offenses at the Educational Credit Union in Topeka was a robbery at 11:20 a.m. on December 30, 2011. The robber had ridden a bicycle to the credit union and entered with a mask or material over his face. He collected the money in a fanny pack, which was described by different witnesses as blue, blue and possibly another color, and blue with a black strap. Surveillance photos showed the robber and the fanny pack. Defense counsel argued that the man in the surveillance photos did not look like Defendant. The robber left on the bicycle. A very similar bicycle was found shortly thereafter less than three blocks away. Agent Hauger provided location data for the 9859 phone. From 10:59 to 11:15 a.m. it was in downtown Topeka, no more than a mile from the credit union.

The second offense at the credit union was an attempted robbery at about 11:20 a.m. on February 9, 2012. Defendant rode a bicycle there. He was wearing sunglasses and a hood pulled over his head. One witness said he had a bandana or other fabric covering his face until he saw the security guard, when he lifted his hood and glasses and pulled the bandana off his face. The guard, however, said that the bandana was around his neck and not over his face (unlike the earlier robbery when the robber's

9

face was covered).  Defendant carried a fanny pack that appeared to an employee present on both occasions to be the same one used by the robber during the December robbery. When the guard, who was by then standing in back of the teller, asked to speak to Defendant, he left the credit union and started running; but he injured his ankle and was captured.  He was taken to a hospital, where an officer heard him tell a nurse that he had gone to the credit union to get a penny roll but fled because a man pulled a gun on him. The fanny pack recovered by the officers contained a semi-automatic gun. The recovered fanny pack did not, however, have the same red splotch on it that the fanny pack had in the surveillance footage from the December robbery.  FBI Agent Bruce Hudson testified that the splotch may have been a removable tag.

Agent Hauger also provided location data for the 9859 phone on the day of the attempted robbery.  Less than five minutes after the attempted robbery the phone was used in downtown Topeka, no farther than a mile from the credit union.  Defendant's Honda with the phone in it was found about half a block from where the bike had been found after the earlier robbery.  There was no evidence of who might have used the phone after the attempted robbery.

## II.    DISCUSSION

### A.    Challenge to Jury

We begin our review of this issue by summarizing the peculiar events at jury selection.  During voir dire, juror 121 observed Defendant mouth the words "call me" and gesture to her as if he were holding a telephone to his ear.  *Id.* pt. 1 at 250.  In the jury

assembly room at the end of the day, she told the bailiff, in front of the other jurors, what the Defendant had done and that it made her feel "very uncomfortable" because he had her personal information. *Id.* at 209. A court officer called the juror that evening and instructed her not to tell anybody else about the incident. The district court began the next morning by informing counsel about the incident. After Defendant and his counsel conversed off the record, counsel informed the court that Defendant admitted making the gesture but claimed that it was intended for another juror, who had been excused from service.

Defendant moved for a mistrial, but the district court decided to question each juror separately, asking if anything the juror had heard or observed made the juror feel uncomfortable about the Defendant. Three jurors had not heard of the incident. Nine had heard of the incident but unequivocally said that they could set aside what they had heard and could base their decision on the evidence and instructions of law. Juror 76, however, initially expressed concern. When asked if Defendant had done anything that made her uncomfortable, she said, "My honest answer is, it made me sick, but I hope I can not judge him because of that." *Id.* at 232. The court and defense counsel asked several follow-up questions:

> THE COURT: Now, is [what Defendant did] something that you would be able to set aside, because the trial actually has to do with charges involving something else?
>
> [JUROR 76]: Yes.

11

THE COURT: And make a decision based solely on the evidence, and follow the instructions of law the court were to give you? Are you able to do that?

[JUROR 76]: Yes, I am able to do that, but I think as a human being, once something is implanted into your mind, I'll have to make an effort not to.

THE COURT: All right. Right now, you're willing to make that effort?

[JUROR 76]: Yes, sir.

THE COURT: In regards to that, again, I would tell you that the jurors back there have to focus in on the evidence in this case.

[JUROR 76]: Yes.

THE COURT: Follow the instructions of law, and have taken an oath to be fair and impartial to both sides. And again, based on what you said, what you heard, . . . is that going to interfere with your ability to just make your decision based solely on the evidence when it comes to his guilt or innocence?

[JUROR 76]: I believe I will be fine.

. . . .

[DEFENSE COUNSEL]: You got so many words put at you. Do you in your heart think that you can put it aside, judge this case just on the evidence?

[JUROR 76]: Yes, I think I can.

*Id.* at 233–34.

After questioning all the jurors, the court removed juror 121 (the juror who observed the gesture), but kept the rest of the jurors, explaining that "each one of those jurors [who had heard what had happened] indicated that they could set [Defendant's

conduct] aside." *Id.* at 285–86.  Defendant stated that he would withdraw his motion for

a mistrial if the court removed juror 76.  The court refused, explaining:

> "[D]espite her feelings and notwithstanding that, whether or not she could
> still be fair and impartial to both sides, . . . she indicated that she could, and
> she also indicated that she could make a decision based solely on the
> evidence in the courtroom, disregarding that statement from the juror about
> [Defendant's] conduct."

*Id.* at 286.  When instructing the jury after the close of evidence, the court told them not

to let "rumors, suspicions, the defendant's actions during trial, or anything else that [they]

may have seen or heard outside of court influence [their] decision in any way."  *Id.*,

Vol. 1 at 127.

On appeal Defendant challenges the impartiality of his jury.  He argues that the

district court erred in denying his motion for a mistrial and at the least should have

dismissed juror 76.  We reject the challenge.  To determine whether a juror should have

been excused for bias, we ask "whether actual bias existed or whether the circumstances

compel an imputation of inherent bias to the juror as a matter of law such that the

misconduct has prejudiced the defendant to the extent that he has not received a fair

trial."  *United States v. Lawrence*, 405 F.3d 888, 903 (10th Cir. 2005).  We review for

abuse of discretion the denial of a motion for mistrial and the denial of a motion to

remove a juror.  *See id.* (motion for mistrial); *United States v. Gordon*, 710 F.3d 1124,

1155 (10th Cir. 2013) (motion to remove a juror), *cert. denied*, 134 S. Ct. 617 (2013).  A

court abuses its discretion when it makes "a clear error of judgment or exceed[s] the

bounds of permissible choice in the circumstances."  *Id.* at 1156.  We have consistently

affirmed the denial of a motion for mistrial when the jurors expressed their impartiality after receiving or observing potentially prejudicial information. *See Lawrence*, 405 F.3d at 904; *United States v. Hueftle*, 687 F.2d 1305, 1310–11 (10th Cir. 1982); *United States v. Evans*, 542 F.2d 805, 814–15 (10th Cir. 1976). And a court does not abuse its discretion when it refuses to dismiss a juror who has in some way indicated she may not be impartial if she subsequently affirms her impartiality. *See Lawrence*, 405 F.3d at 903.

The court did not abuse its discretion in declining to grant a mistrial and retaining juror 76. There is no evidence of bias with respect to any juror other than juror 76. And even though juror 76 initially expressed concern, she later asserted that she could serve impartially.

Defendant cites three decisions to support his argument. None help him. In *Irvin v. Dowd*, 366 U.S. 717 (1961), the Supreme Court overturned a conviction when voir dire had shown that "[t]wo-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief." *Id.* at 728. We have no such extreme circumstances here. In *Reynolds v. United States*, 98 U.S. 145 (1878), the Supreme Court upheld all the trial court's decisions on whether to excuse or retain jurors, including the decisions to retain two jurors who had admitted having formed an opinion but then stated that their opinions would not impact their verdicts after hearing the evidence. *See id.* at 147, 156–57. And in *Hurtado v. Adams*, No. C 11-00037 PJH (PR), 2013 WL 1636379, at *7–8

14

(N.D. Cal. Apr. 16, 2013), the court on habeas review held that the juror who had expressed concern had been rehabilitated by asserting that she could serve impartially.

We must also note an additional consideration strongly favoring affirmance here. We share the district court's concern about removing jurors as a result of a defendant's misconduct. *See United States v. McCormac*, 309 F.3d 623, 626 (9th Cir. 2002) (permitting a defendant to "profit from her own misconduct . . . would not be correct"); *United States v. Stewart*, 256 F.3d 231, 242 (4th Cir. 2001) (if a defendant could benefit from his own wrongdoing, "it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so" (internal quotation marks omitted)); *see also United States v. Nunez*, 877 F.2d 1470, 1474 (10th Cir. 1989) (affirming denial of mistrial based on codefendant's misconduct).

## B.  Beadles's Confession

Defendant challenges the admissibility of Agent Gentine's testimony about Beadles's confession. During trial Defendant filed a motion in limine to exclude the agent's testimony as violating the Confrontation Clause. The district court denied the motion on condition that Defendant's name be replaced by a neutral pronoun throughout. Agent Gentine, still over Defendant's objection, therefore summarized Beadles's confession as follows:

> [O]n October 19th, [Beadles] was picked up at the intersection of 10th and Main in Kansas City by this other individual who, like I said, had apparently blackmailed or tried to blackmail Mr. Beadles. This other person picked him up in what Mr. Beadles described as a gray Honda four-door with Missouri license plates. They then drove to Topeka, searching

15

for a bank to rob. Mr. Beadles stated that he—I guess because he was comfortable with the Kaw Valley Bank, he'd previously robbed that one, they stopped in the vicinity of that bank near in an alley. They donned these masks that were provided by this other individual. They went in, robbed the Kaw Valley Bank. He said again that he had stood in the doorway while this other person went into the bank, took the—took the money from the drawers, the teller drawers. They then left in the gray Honda, drove back to actually Leavenworth this time. The other person dropped him off at a KMart near where the Grossman Center is, gave Mr. Beadles a cut of the money, about $4,000. They had robbed—robbed the bank, Mr. Beadles had thought about 12,000—12 to $13,000, and this other person gave Beadles $4,000 of that money, and after that, Mr. Beadles had never seen—had not seen this other person since.

R., Vol. 2 pt. 3 at 1201–02.

Defendant's motion in limine should have been granted. "[T]he Sixth Amendment preclude[s] the admission of out-of-court statements that are testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *United States v. Clark*, 717 F.3d 790, 814–15 (10th Cir. 2013) (internal quotation marks omitted). Statements made during police interrogation, such as the one made by Beadles, are testimonial. *See Crawford v. Washington*, 541 U.S. 36, 52–54 (2004). There can be no doubt that the Confrontation Clause prohibited admission of Beadles's statement.

The error by the government and the district court was to rely on case law relating to evidence offered at a joint trial of two defendants. In that circumstance, admission into evidence of the confession of a codefendant (which does not violate the confrontation rights of the codefendant) can be proper at the joint trial if the court protects the defendant from prejudice arising from the admission. Noting that *Bruton v. United*

16

*States*, 391 U.S. 123 (1968), ordinarily forbids the introduction of one defendant's confession at a joint trial, we have said: "[W]here a defendant's name is replaced with a neutral pronoun or phrase there is no *Bruton* violation, providing that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury." *United States v. Verduzco-Martinez*, 186 F.3d 1208, 1214 (10th Cir. 1999). This analysis applies, however, only because the statement was admissible against the confessing defendant. In *Bruton* itself the Court dealt with the confession of a codefendant jointly tried with the defendant challenging the admission of the confession. *See* 391 U.S. at 137. A trial of a single defendant is different. As we said in *United States v. Hill*, 901 F.2d 880, 883 (10th Cir. 1990): "Of course, if the district court grants a motion to sever [the trials of the two defendants], *Bruton* problems will never arise. The only evidence that will be admitted in each trial will be the evidence that is admissible against each particular defendant."

Redaction of a codefendant's confession cannot make it admissible against the defendant. Redaction does not override the Confrontation Clause. It is just a tool to remove, in appropriate cases, the prejudice to the defendant from allowing the jury to hear evidence admissible against the codefendant but inadmissible against the defendant. The practice was first approved by the Supreme Court in *Richardson v. Marsh*, 481 U.S. 200 (1987), which concerned the admission of a confession at a joint trial, *see id.* at 202. The Court endorsed redaction to preserve the efficiencies and fairness of joint trials. *See id.* at 209–10. Every published Tenth Circuit opinion applying *Richardson* has involved

17

a confessing codefendant tried with the defendant. *See, e.g., United States v. Green*, 115 F.3d 1479, 1480, 1485 (10th Cir. 1997). *See generally* 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence §§ 105.05–105.06 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2013) (admissibility of evidence in joint trials).

Nevertheless, the error was harmless. When evidence is admitted in violation of the Confrontation Clause, we need not reverse if the error was harmless beyond a reasonable doubt. *See United States v. Chavez*, 481 F.3d 1274, 1277 (10th Cir. 2007). That standard is satisfied here. Beadles's statement related only to the October 29, 2010 robbery, and Defendant was acquitted on that charge. Defendant argues that despite the acquittal, the testimony impacted all the counts of the indictment. But the evidence on the other counts was very strong, and Defendant does not explain how Beadles's testimony could have been essential to convincing the jury of his guilt of the other offenses when it was unable to convince the jury that Defendant was guilty of the robbery about which Beadles testified.[2]

## C. Evidence of Uncharged Bank Robbery

Defendant filed a motion in limine to prevent the government from presenting evidence of a March 18, 2011 bank robbery not charged in the indictment. He argued

---

[2] At oral argument Defendant's counsel argued that Beadles's statement corroborated the cell-phone tracking evidence that played a crucial role in the entire case and that without his statement the cell-phone tracking evidence would not have been credible. We do not consider this questionable proposition because it was not presented in Defendant's opening brief. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

that it was evidence of other crimes, inadmissible under Fed. R. Evid. 404(b). The

government responded that evidence of the March robbery was not other-crimes evidence

but background evidence "inextricably intertwined with the charged offense." R., Vol. 1

at 114 (internal quotation mark omitted). The court denied Defendant's motion in limine,

ruling, "[T]he court will allow the testimony in a very limited nature regarding the

March 18th, 2011 uncharged robbery." *Id.*, Vol. 2 pt. 1 at 58.

The heart of the evidence of this robbery was brief testimony by Rudisill. He said

that on March 18, 2011, Defendant asked him to pick up a man (whom Defendant called

his brother) walking down Fifth Street in Leavenworth. He complied. Later he learned

"that a bank was robbed and [he] kind of put things together." *Id.* pt. 3 at 1057. Other

witnesses confirmed that a credit union in Leavenworth was robbed on March 18, 2011.

The district court said that the testimony "could provide context, without which

Mr. Rudisill's testimony would be confusing to the jury, and is inextricably intertwined

to the charged crimes." *Id.* pt. 1 at 58. But we are inclined to agree with Defendant that

the evidence had too little relevance to be admissible. Still, when the admission of

evidence was a nonconstitutional error, reversal is required only if the evidence "(1)

substantially influenced the outcome of the trial, or (2) [leaves the court] in grave doubt

as to whether [it] had such an effect." *United States v. Ledford*, 443 F.3d 702, 712 (10th

Cir. 2005) (brackets and internal quotation marks omitted). "The government bears the

burden to show that a nonconstitutional error is harmless by a preponderance of the

evidence." *See United States v. Stiger*, 413 F.3d 1185, 1190 (10th Cir. 2005).

19

The evidence previously summarized shows strong evidence of guilt of the three robberies and the one attempted robbery. And the evidence tying Defendant to the March 2011 robbery is so tenuous that we fail to see how it could have influenced the verdict. We hold that admission of the evidence was harmless.

### D.    Sentencing Challenge: Prior Conviction

Three counts charged Defendant with violating § 924(c)(1)(C)(i) by carrying a firearm during a crime of violence. This statute imposes "a term of imprisonment of not less than 25 years" if the conviction is a "second or subsequent conviction under this subsection." 28 U.S.C. § 924(c)(1)(C)(i). At sentencing, the district court therefore imposed the statutory mandatory minimum sentence of 25 years on each of the three counts after determining that Defendant's convictions on those counts were second or subsequent convictions of § 924(c)(1). (Defendant had been convicted in 1991 of violating § 924(c)(1).) Defendant did not object at sentencing to this judicially found fact.

On appeal, however, Defendant argues that the fact of his prior conviction had to be alleged in the indictment and found by a jury beyond a reasonable doubt. We must reject the argument. As Defendant concedes, Supreme Court and Tenth Circuit precedent are to the contrary, *see Almendarez-Torres v. United States*, 523 U.S. 224 (1998); *United States v. Moore*, 401 F.3d 1220, 1221, 1224 (10th Cir. 2005), and he raises the issue "only to preserve Supreme Court Review," Aplt. Br. at 32. Accordingly, we affirm his sentence.

20

**II.     CONCLUSION**

We AFFIRM Defendant's convictions and sentence.