FILED
United States Court of Appeals
Tenth Circuit

August 4, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 11-1487 |
| DAVID A. BANKS, | |
| Defendant - Appellant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 11-1488 |
| KENDRICK BARNES, | |
| Defendant - Appellant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 11-1489 |
| DEMETRIUS K. HARPER, a/k/a Ken Harper, | |
| Defendant - Appellant. | |

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

CLINTON A. STEWART, a/k/a C. Alfred Stewart,

        Defendant - Appellant.

No. 11-1490

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

GARY L. WALKER,

        Defendant - Appellant.

No. 11-1491

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

DAVID A. ZIRPOLO,

        Defendant - Appellant.

No. 11-1492

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:09-CR-00266-CMA)**

---

Charles Henry Torres of Charles H. Torres, P.C., Denver, Colorado, on the briefs for Defendant-Appellant David A. Banks.

Gwendolyn Maurice Solomon, Colorado Springs, Colorado, and Joshua Sabert Lowther of the National Federal Defense Group, Savannah, Georgia, on the briefs for Defendants-Appellants Kendrick Barnes, Demetrius K. Harper, Clinton A. Stewart, Gary L. Walker, and David A. Zirpolo.

John F. Walsh, United States Attorney, James C. Murphy, Assistant United States Attorney, and Matthew T. Kirsch, Assistant United States Attorney, Denver, Colorado, on the brief for Plaintiff-Appellee.

---

Before **HARTZ**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Defendants-Appellants David A. Banks, Kendrick Barnes, Demetrius K. Harper, Clinton A. Stewart, Gary L. Walker, and David A. Zirpolo (collectively "Defendants") were convicted following a jury trial in the District of Colorado of multiple counts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349.[1]  Defendants were sentenced to terms of imprisonment ranging

---

[1]  Defendants asked us to forgo oral argument and to decide their appeals based on their written submissions, and the government did not oppose their request. After examining the appellate record, this three-judge panel decided unanimously that oral argument would not be of material assistance in the determination of these appeals, so it granted Defendants' unopposed request. *See* Fed. R. App. P. 34(a)(2); *id.* § 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

3

from 87 to 135 months. Defendants assert the following four issues on appeal: (1) their right to a speedy trial was violated when the district court granted multiple continuances of the trial date (at Defendants' request); (2) the district court compelled co-Defendant Barnes to testify in violation of his Fifth Amendment privilege against self-incrimination and failed to give a proper curative instruction; (3) the district court abused its discretion in excluding the testimony of two witnesses Defendants sought to call at trial; and (4) the cumulative effect of the district court's otherwise harmless errors prejudiced them and requires reversal.[2] Exercising our jurisdiction under 28 U.S.C. § 1291, we **affirm**.

## I[3]

Defendants operated or were associated with the entities Leading Team, Inc. ("LT") and DKH, Inc. ("DKH"). LT and DKH were formed to produce and assist in the production of software. In 2003, Defendants stopped operating LT

---

[2]     During the briefing phase of this litigation, all Defendants were represented by the same attorneys, except for Mr. Banks. The non-Banks Defendants filed a joint opening brief, styled "Appellants' Principal Brief," and a reply brief, styled "Appellants' Reply Brief." Through his separate counsel, Mr. Banks filed his own opening and reply briefs. After briefing was concluded, Mr. Banks's counsel withdrew with permission of the court, and one of the lawyers for the other Defendants entered an appearance on Mr. Banks's behalf. The government filed one consolidated answer brief, addressing the arguments of all Defendants.

[3]     We set forth here the relevant background facts. Given the fact-sensitive nature of the issues raised on appeal, we provide additional factual information relevant to each issue in the section to which the facts pertain.

and began operating a third entity, IRP Solutions Corporation ("IRP"). IRP was formed to produce computer software, including a software program called Case Investigative Life Cycle ("CILC"), that would supposedly provide a nationally accessible database for law-enforcement agencies, "computerize their systems," and "prevent hacking and identity theft." R., Vol. 2, at 1288 (Jury Trial Tr., dated Sept. 29, 2011) (Test. of Karen Chavez of Today's Office Staffing); *see also id.* at 845 (Jury Trial Tr., dated Sept. 27, 2011) (explanation of co-Defendant Harper that he intended the software to "help our men and women on the front lines against terrorism, against cyber crimes, to help them do their jobs better"); *id.* at 862–63 (explanation of co-Defendant Stewart that he expected the software to eliminate "process inefficiencies, like the ones that law enforcement officials did not connect the dots from one piece of intelligence information to another, which was the route that caused 9/11"). Mr. Walker was the President of IRP, Mr. Banks was the Chief Operating Officer, and the remaining Defendants held other executive positions.

Beginning around October of 2002, acting on behalf of DKH, LT, and IRP, Defendants contacted numerous staffing agencies to "assist in providing temporary services." *Id.* at 1638 (Jury Trial Tr., dated Oct. 3, 2011) (Test. of Courtney Mullen of The Computer Merchants). Most of these staffing companies provide two core services: "staff augmentation and payrolling." *Id.* at 2619 (Jury Trial Tr., dated Oct. 12, 2011) (Test. of Joseph Thurman of Innovar Group). In

5

the first type of transaction—staff augmentation—"clients" like Defendants' entities "ask for certain skills," and the staffing company's "recruiters . . . find candidates" with those skills "and then place them on assignment." *Id.* at 1015 (Jury Trial Tr., dated Sept. 28, 2011) (Test. of Donald Crockett of CTG, Inc.). By contrast, in the second type of transaction—payrolling—the client has already pre-selected individuals it would like the staffing company to retain. The staffing company therefore simply hires those individuals for the client and subsequently pays those employees' wages and handles their taxes and workers' compensation. *Id.* at 741–42 (Test. of Renee Rodriquez of Express Employment Professionals); *see id.* at 693 (Test. of Scott Tait of Adecco) ("Payrolling is where the company already knows who they want to hire, they run it through us as W2'd employees, so that they are covered under their insurance and workman's comp, unemployment and the risk liability."). The staffing company receives a premium for its services in both of these transactions. However, because in a payrolling transaction the staffing company is "not doing as much work," its "profit margin is significantly lower." *Id.* at 1507 (Jury Trial Tr., dated Sept. 30, 2011) (Test. of Susan Slakey of ESG Consulting).

As is relevant here, witnesses from multiple staffing companies testified that a Defendant (or someone acting as Defendants' agent) approached them and expressed the desire for payrolling services. One exemplar transaction, as described by a representative of ESG Consulting, arose when Mr. Banks, on

6

behalf of IRP, contacted ESG regarding "a project that [IRP] wanted ESG to support them with by bringing in a consultant to do some technical work." *Id.* at 1476. In that particular transaction, Mr. Banks requested that ESG retain "[t]he services of Kendrick Barnes" for IRP.[4] *Id.* at 1477. No doubt aware that payrolling "isn't that lucrative for the [staffing] company," *id.* at 1639, Mr. Banks assured ESG that IRP was developing software for "Homeland Security, FBI and [the] police," *id.* at 1476. He did so presumably to signify that IRP's "business was to grow," *id.* at 1639, and that, because IRP "had money coming in through the software they were developing for Homeland Security and other government entities," *id.* at 1491, ESG (and the other staffing companies) could expect more lucrative transactions with IRP in the future. *See also id.* at 1400 (Test. of Gregory Krueger of Agile 1) (explaining that, from his company's perspective, if Defendants' companies "were actually in business and engaging in a source of revenue, then we knew we were going to be paid for providing our payrolling service"); *id.* at 1414 (noting that co-Defendants Stewart and Harper "led [his staffing company] to believe that the business was being conducted" and "that

---

[4] Similarly, an area director of staffing company Adecco explained that Adecco's practice is to "marry" clients (meaning companies like IRP, DKH, and LT) with "contractors" (meaning employees). R., Vol. 2, at 692. He testified that Mr. Banks contacted Adecco on behalf of LT because "he needed a team of software engineers" to help with "a project that was close to completion," *id.* at 695—*viz.*, a software project. Thus, under that arrangement, Adecco's function was to "marry" the client (LT) with the "contractors." And in this transaction, the "contractors" Mr. Banks wanted Adecco to hire for LT were individuals affiliated with DKH. *See id.* at 697.

7

DKH was invoicing a [law-enforcement] client and getting paid for the work it was performing" vis-à-vis software development).

In other words, the staffing-company witnesses testified that they were induced into believing that Defendants' companies were either doing business with major law-enforcement agencies or were on the verge of selling CILC software to these agencies. These witnesses also testified that Defendants (or Defendants' agents) assured them that this alleged law-enforcement business would enable Defendants' companies to pay the staffing companies' invoices—and, critically, that they relied on these representations in choosing to do business with Defendants. *See, e.g.*, *id.* at 726 (affirming that "[we] made a decision to engage in business based on . . . contacts [Defendants] may have had"); *id.* at 763 (noting that the effect of Defendants' representations concerning law-enforcement contacts was "[a] large one" because those government agencies are considered "stable customers"). As a result, the staffing companies agreed to hire Defendants' pre-selected contract employees and pay their salaries. For example, in the situation detailed above, ESG hired Mr. Barnes "as a W2 employee, which means [ESG was] responsible for paying him, for paying all payroll taxes and statutory insurance and taxes on him." *Id.* at 1482.

Trial testimony from representatives of the law-enforcement agencies with whom Defendants claimed to be doing business—including the Department of Homeland Security ("DHS"), the New York City Police Department ("NYPD"),

8

and the Department of Justice ("DOJ")—revealed the falsity of Defendants' representations to the staffing companies. These witnesses averred that Defendants' companies had *not*, in fact, sold CILC software to their respective agencies and, moreover, that Defendants lacked any basis for believing that any such sales were imminent. *See id.* at 1135 (Test. of Paul Tran of DHS) (answering "no" to the question, "[D]id you make any representations that [DHS] would buy the CILC software?"); *id.* at 2977–78 (Jury Trial Tr., dated Oct. 17, 2011) (Test. of Steven Cooper of DHS) (answering "no" to the question, "[W]ould you have made any statements that would have suggested that [DHS] was going to buy their software?").

The cracks in the foundation of misrepresentations constructed by Defendants began to show when the time came for the staffing companies to be compensated by Defendants' companies for having paid the contract employees' wages. Seeking remuneration for their services, the staffing companies would send invoices to Defendants' companies to cover the wages and a small markup. *See, e.g.*, *id.* at 697 ("Adecco paid [the employees of] DKH. . . . And Leading Team was supposed to pay Adecco."); *id.* at 2169 (Jury Trial Tr., dated Oct. 5, 2011) (Test. of U.S. Att'y Auditor) (describing invoices relating to "Leading Team account"). When Defendants did not pay the invoices, they initially attempted to fend off the staffing companies' collection efforts by explaining that they were "working with the government, and . . . waiting on some payments"

9

because of "how slow the government could be."[5] *Id.* at 752. Stated otherwise, when questioned about their failure to pay the staffing companies' invoices, Defendants gave false assurances that payment would be forthcoming, and they continued to imply that they were doing business with large government law-enforcement agencies.

Evidence adduced at trial also demonstrated that Defendants employed various tactics to prevent the victim companies from learning that they would not be paid. Most notably, Defendants used entities they controlled as references in credit applications, *see id.* at 1478 (noting that Mr. Banks provided "DKH" as a credit reference); submitted time cards to staffing companies in which they reported time using various aliases, *see id.* at 2059 (Test. of FBI Agent Eric Black) (directing the jury's attention to "the name in parentheses next to Rico Howard called Clint Stewart"); and reported overlapping hours for the same employee at multiple staffing companies, *see id.* at 2383–88 (Jury Trial Tr., dated Oct. 7, 2011) (Test. of software developer William Williams) (providing the example that Mr. Barnes reported working a total of twenty-four or more hours in

---

[5]     At other times, these interactions were significantly more contentious. Kathryn Losey-Miller of staffing company AppleOne described such a situation: she called Mr. Banks to discuss a meeting IRP purportedly had with the NYPD, i.e., "did he close the contract . . . [d]id he have the money . . . , and when could [the staffing company] expect payment." R., Vol. 2, at 1064. Mr. Banks grew very angry with her for asking if he had been paid by his supposed law-enforcement contacts. *See id.* As Ms. Losey-Miller recited the conversation, she countered, "I am calling to ask for money because we[, AppleOne,] have been payrolling your people . . . [and] deserve to be paid." *Id.* at 1065.

10

a day for three different staffing companies on approximately twenty-three different days).

In the end, forty-two different staffing companies were left with outstanding invoices totaling in excess of $5,000,000—amounts Defendants' companies had not paid (and apparently could not pay), and which could not be submitted to the government agencies, which had no business relationship with Defendants' companies.

On June 9, 2009, Defendants were indicted on multiple counts of conspiracy to commit mail fraud and wire fraud, and committing mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1349, 1341, and 1343. Trial commenced on September 26, 2011. Although Defendants were represented by counsel prior to trial, they elected to proceed pro se during trial.[6] On October 20, 2011, the

---

[6] Prior to trial, beginning in July 2009, Mr. Banks's co-defendants began expressing their wish to join in his various filings. *See, e.g.*, R., Vol. 1, at 82 (Mot. to Join, filed July 7, 2009) (reflecting Mr. Zirpolo's request to "join and adopt motions filed by [Mr.] Banks as they may apply to [him]"). Subsequent motions filed by Mr. Banks were accompanied by similar requests from his co-defendants to join. No doubt attempting to improve the efficiency in a multi-defendant lawsuit, the district court gave its blessing to Defendants' efforts to join in one another's arguments at various stages of the litigation. *See, e.g.*, *id.*, Vol. 2, at 41 (Status Conf. Tr., dated Dec. 18, 2009) ("I think it would be much more useful to have the joint motions."); *id.* at 56 ("[I]t makes my job a lot easier if I don't have to comb through six motions, and I can do one that you all jointly agreed to. So I will allow that in this case."). Notably, with respect to their statutory and constitutional speedy-trial claims, the district court explicitly declared that it would "give [non-Banks] Defendants the benefit of the doubt and construe their motion as 'incorporating' Defendant Banks' motion." *Id.*, Vol. 1, at 1594 n.1 (Order Den. Mots. to

(continued...)

jury returned guilty verdicts as to all Defendants on one or more counts of mail

fraud and wire fraud, and conspiracy to commit mail fraud and wire fraud. This

consolidated appeal followed.

## II

Defendants assert four issues on appeal.[7] First, Defendants argue that the

---

[6](...continued)
Dismiss, filed June 28, 2012). As indicated, at trial Defendants represented themselves. And the district court understood them to be presenting "a joint defense," *id.* at 1579 (Order Den. Mot. for J. of Acquittal & Alt. Mot. for New Trial Based on Fifth Amend. Violations, filed June 28, 2012), as expressly reflected in the court's rulings on certain contested matters, *see id.*, Vol. 2, at 2341 (excluding the testimony of two witnesses as a discovery sanction because "[D]efendants ha[d] not offered any legitimate reasons for failing to submit their Rule 16 disclosures" regarding them). In light of the foregoing, we, too, proceed on the premise that Defendants mounted a unified defense before the district court; thus, insofar as one Defendant properly lodged an objection, he shall be deemed to have preserved the challenged matter for appeal as to all Defendants.

[7]      Defendants seem intent on proceeding collectively on appeal as they did before the district court—specifically, by adopting each other's arguments for reversal. *Compare* Aplts.' Principal Br. at 64 (noting that non-Banks Defendants "adopt by reference the Argument in Appellant Banks' Opening Brief"), *with* Banks's Opening Br. at 1 (noting that he "adopts by reference . . . co-Defendants' arguments"). The skeletal remarks to that effect in their briefs fall far short of optimal practice and do not provide us with much "direction[,] . . . specifically, how the [particular] argument applies to the adopting Defendant." *United States v. Renteria*, 720 F.3d 1245, 1251 (10th Cir. 2013), *cert. denied*, --- U.S. ----, 134 S. Ct. 969 (2014). However, given the nature of the scheme and, more generally, the factual context of this case, we are able to perceive "a clear and straightforward application" of the legal principles at issue to the circumstances of each Defendant. *Id.* Accordingly, we are willing to resolve this case on the view that Defendants are proceeding collectively on appeal. *See United States v. Morgan*, 748 F.3d 1024, 1035 n.13 (10th Cir. 2014) ("Mr. Ford . . . attempted to join the entirety of the other Defendants' briefs without explaining how the arguments apply to him. Generally, [t]his is problematic because it requires the court to sift through the briefing and record and
(continued...)

district court violated their statutory and constitutional rights to a speedy trial by granting four continuances that were requested by Defendants. Second, Defendants contend that the district court compelled co-Defendant Barnes to testify in violation of the Fifth Amendment privilege against self-incrimination, thereby prejudicing all Defendants, and failed to give a proper curative instruction. Third, Defendants argue that the district court abused its discretion in excluding the testimony of two purported expert witnesses. And, finally, Defendants contend that the cumulative effect of the district court's otherwise harmless errors prejudiced them and constitutes reversible error. We address each of these arguments in turn.

## A

We review the denial of a motion to dismiss for violation of the Speedy Trial Act (the "Act") for abuse of discretion. *See United States v. Thompson*, 524 F.3d 1126, 1131 (10th Cir. 2008). We also review the decision to grant an ends-of-justice continuance for abuse of discretion. *See United States v. Toombs*, 574 F.3d 1262, 1268 (10th Cir. 2009). In other words, we review the district court's

---

[7](...continued)
imagine which arguments might apply to which Defendants. In this instance, however, because Mr. Sanford's and Mr. Morgan's arguments can apply to Mr. Ford, we consider this issue as to him." (alteration in original) (citation omitted) (internal quotation marks omitted)). Consequently, we deem the four arguments before us as being advanced by each Defendant.

13

compliance with the legal requirements of the Act de novo and its underlying factual findings for clear error. *See id.* "We review [a defendant's] Sixth Amendment [speedy-trial] claim de novo, but accept the district court's factual determinations unless clear error is shown." *United States v. Gould*, 672 F.3d 930, 935 (10th Cir. 2012); *accord United States v. Madden*, 682 F.3d 920, 929 (10th Cir. 2012); *see also United States v. Larson*, 627 F.3d 1198, 1207 (10th Cir. 2010) ("[Defendant's] claim that his Sixth Amendment speedy trial right was violated is reviewed *de novo*.").

Defendants first argue that their statutory right to a speedy trial, under 18 U.S.C. § 3161(c)(1), was violated when the district court granted multiple continuances of their trial date. Defendants also argue that their Sixth Amendment right to a speedy trial was violated. We begin by addressing whether Defendants' statutory right to a speedy trial was violated, and then proceed to address the separate question of whether Defendants' constitutional right to a speedy trial was violated.

**1**

The Speedy Trial Act requires that a federal criminal trial commence within seventy days of the filing of the indictment or the defendant's initial appearance, whichever occurs later. *See* 18 U.S.C. § 3161(c)(1); *Toombs*, 574 F.3d at 1268. The Act excludes from this seventy-day period, *inter alia*, "[a]ny period of delay

14

resulting from a continuance . . . if the judge granted such a continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  A court is required to set forth on the record, either orally or in writing, its reasons for making such a determination.  *See id.*  We have repeatedly noted that an ends-of-justice continuance is "meant to be a rarely used tool for those cases demanding more flexible treatment," *Toombs*, 574 F.3d at 1269 (quoting *United States v. Doran*, 882 F.2d 1511, 1515 (10th Cir. 1989)) (internal quotation marks omitted), and "should not be granted cavalierly," *United States v. Williams*, 511 F.3d 1044, 1049 (10th Cir. 2007).

In determining whether to grant an ends-of-justice continuance, the district court must consider the factors listed in 18 U.S.C. § 3161(h)(7)(B).  These factors include:

> (i)    Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice[;]

> (ii)    Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section[;]

> (iii)    Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the

15

arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex[; and]

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B).

"[T]he record must clearly establish [that] the district court considered the proper factors at the time such a continuance was granted." *Larson*, 627 F.3d at 1204 (alterations in original) (quoting *Toombs*, 574 F.3d at 1269) (internal quotation marks omitted). "If the district court fails to consider these factors, the continuance 'period cannot be excluded under the Act's ends-of-justice provision.'" *Id.* (quoting *Williams*, 511 F.3d at 1057). Similarly, if the court fails to make its findings on the record, "there can be no exclusion . . . [and] the delay resulting from the continuance must be counted." *Id.* (quoting *Zedner v. United States*, 547 U.S. 489, 507–08 (2006)) (internal quotation marks omitted); *see also United States v. Occhipinti*, 998 F.2d 791, 797 (10th Cir. 1993) ("[T]he trial court must make explicit findings regarding why granting the continuance will strike a

16

proper balance between the ends of justice and the best interest of the public and the defendant in a speedy trial."). Although the record "must explain 'why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time,'" *Larson*, 627 F.3d at 1204 (quoting *Toombs*, 574 F.3d at 1271), "the district court need not articulate facts which are obvious and set forth in the motion for the continuance itself," *id.* (quoting *Toombs*, 574 F.3d at 1269) (internal quotation marks omitted).

With this framework in mind, we turn now to the four continuances at issue.

1.      Continuance Granted on July 9, 2009

On July 6, 2009, then-counsel for co-Defendant Banks filed an unopposed motion for an ends-of-justice continuance of ninety days under 18 U.S.C. § 3161(h). In support of the motion, Mr. Banks made the following allegations: (1) the investigation into Defendants' conduct spanned multiple years and involved several federal agencies; (2) the indictment contained twenty-five counts and listed six defendants and forty-two separate victims; (3) Defendants had been informed by the government that discovery materials occupied approximately thirty boxes, which the government was working to organize and scan into a digital format; (4) the government had informed defense counsel that discovery would be made available in stages, with an expected completion date of July 27,

17

2009; and (5) it was unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself by the September 1, 2009, speedy-trial deadline due to the voluminous discovery, multiple defendants, and complex nature of the allegations in the matter.

On July 9, 2009, the district court issued a written order granting the motion for a continuance pursuant to 18 U.S.C. § 3161(h)(8)(A). As the basis for its order, the court found as follows:

> Due to the voluminous discovery, multiple defendants, and complex nature of the allegations in this matter, denying the requested continuance would result in a miscarriage of justice by denying Defendants an adequate opportunity to prepare for trial, despite the exercise of due diligence. Pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B)(ii), the ends of justice that will be served by excluding the requested period of continuance from the speedy trial calculation outweigh the best interests of the public and the Defendants in a speedy trial.

R., Vol. 1, at 89–90 (Order Granting Continuance, filed July 9, 2009).

Defendants now contend that the ninety-day continuance should not have been granted because: (1) defense counsel had yet to receive discovery; (2) the court failed to hold a hearing on the matter; (3) the government failed to voice any opposition to the motion; and (4) the court could not have known whether the case was complex as of the date the motion was granted. We do not find Defendants' assertions persuasive. Rather, we find that the facts alleged in Defendants' motion warranted the district court's issuance of a continuance. As

18

detailed in Defendants' motion, the investigation underlying the charges at issue spanned several years, involved the production of thousands of documents, and implicated Defendants in crimes involving forty-two victim companies. Thus, it was reasonable for the court to conclude that Defendants required additional time in order to effectively prepare for trial. *See United States v. Spring*, 80 F.3d 1450, 1457 (10th Cir. 1996) (recognizing that "[a]dequate preparation time . . . [is] clearly [a] permissible reason[] for granting a continuance and tolling the Speedy Trial Act").

Moreover, it was not necessary for the district court to conduct a hearing, given that the facts alleged in the motion were undisputed. The district court's order makes clear that it properly considered the required statutory factors and determined that the ends of justice would be served by granting a ninety-day continuance. For these reasons, we conclude that the district court's grant of a ninety-day continuance was not an abuse of discretion.

2.   Continuance Granted on August 20, 2009

On August 18, 2009, co-Defendant Stewart filed an unopposed motion under 18 U.S.C. §§ 3161(h)(7)(A) and (B), seeking an ends-of-justice continuance of 110 days. All Defendants concurred in the motion. In support of the motion, Mr. Stewart alleged, *inter alia*, that: (1) the FBI investigation of Defendants began on March 25, 2004 and resulted in a search of Defendants' offices on

19

February 9, 2005; (2) the affidavit supporting the search included reports from ten witness interviews and indicated that thirty-three employees of Defendants' companies were staffed through victim companies; (3) the search involved as many as twenty law-enforcement officers and spanned a period of over fourteen hours; (4) over twenty boxes of paper documents were seized during the search of Defendants' offices; (5) the government made electronic copies of the hard drives of seven computer servers and over forty individual computers, resulting in approximately 1.8 terabytes of electronic data; (6) discovery produced by the government consisted of approximately 20,000 scanned images, which Defendants were continuing to review at that time; (7) the indictment charged a conspiracy involving forty-two victim companies, requiring defense counsel to investigate and interview witnesses regarding events that occurred over a nearly seven-year time period; (8) defense counsel estimated that it would need to conduct nearly one hundred interviews during the pretrial preparation period; and (9) Defendants needed to review the discovery materials and interview witnesses in order to effectively prepare for trial, and this could not be reasonably completed by October 7, 2009, taking into account the exercise of due diligence. *See* R., Vol. 1, at 98 (Mot. for Excl. of Time, filed Aug. 18, 2009) (noting, with regard to interviews, that this "[was] a conservative estimate" of what would be necessary).

At the August 20, 2009, status conference, the district court considered

Defendants' motion and made oral findings that the ends of justice would be served by granting the requested continuance. During the hearing, the court confirmed with the government that the factual allegations set forth in Defendants' motion were accurate and that all parties believed a continuance was necessary in order to allow Defendants to adequately prepare for trial.

The court then made the following factual findings: (1) Defendants were charged with engaging in a complex financial scheme occurring over a seven-year period; (2) defense counsel was in the process of reviewing extensive discovery involving thousands of pages of documents and needed to conduct between fifty and one hundred witness interviews; and (3) defense counsel and the government had been "diligent in conforming to their discovery obligations and obtaining the appropriate witnesses." *Id.*, Vol. 2, at 27 (Status Conf. Tr., dated Aug. 20, 2009). The court then expressly concluded that the ends of justice served by granting the continuance outweighed the interest of the public and Defendants in a speedy trial, and that the failure to grant the continuance "would likely result in a miscarriage of justice by precluding [D]efendants from adequately preparing for trial," most notably by preventing Defendants from "thoroughly reviewing the 20,000 scanned images produced by the Government in July of 2009, and unreasonably limiting [D]efendants' ability to interview the necessary witnesses, including law enforcement officers and employees of the companies involved."

21

*Id.* at 28. The court further concluded that the case was "so unusual and complex that it would be unreasonable" to expect Defendants to prepare for trial within the time limits set forth by the Act and the district court's previous order. *Id.* In addition to making the above findings and conclusions, the court questioned defense counsel regarding when they would be prepared to file pretrial motions and to set a trial date.

Thus, contrary to Defendants' assertions, the court fully set forth the bases for granting the continuance and supported its conclusions with detailed factual findings. As such, the district court did not violate Defendants' rights under the Act by granting the continuance and excluding 110 days from the speedy-trial calculations.

3. Continuance Granted on December 18, 2009

On December 14, 2009, defense counsel jointly moved for an additional ends-of-justice continuance of 361 days. In their motion, Defendants set forth "particularized facts supporting the requested exclusion of time," *id.*, Vol. 1, at 103 (Joint Mot. for Excl. of Time, filed Dec. 14, 2009) (capitalization altered), and recited factual details regarding the extensive amount of discovery required, the number of witnesses involved, and the length of the government's investigation, *see id.* at 103–07. The motion also recited how Defendants had used the previous 110-day period excluded by the court and why Defendants

22

needed additional time to prepare for trial.

Specifically, Defendants alleged, *inter alia*, that: (1) due to the volume of material produced during discovery, it was not enough for Defendants to merely review the material; rather, the documents—including emails, letters, FBI 302 reports, and civil pleadings—needed to be cross-referenced in order to be reviewed, compared, and contrasted; (2) Defendants needed additional time to learn and become familiar with industry and government practices; (3) review of the discovery to date revealed at least 130 potential witnesses, many of whom were located outside of Colorado; (4) Defendants needed to obtain permission from the court to travel, and interviews could not be conducted until Defendants had reviewed enough of the discovery to have a clear understanding of the issues to be covered in the interviews and to fully assess any prior statements made by the prospective witness in those discovery materials; (5) Defendants would need considerable time to review any co-conspirator statements the government might seek to introduce pursuant to Federal Rule of Evidence 801(d)(2)(E); and (6) Defendants and the government had met to discuss the contents of the motion, and there was no dispute with respect to any of the facts set forth in the motion.

At the next status conference, the court questioned the parties in detail regarding the need for the continuance. The court noted that it was "very hesitant to enter an order that would extend this case by almost a year, especially given

23

the other extensions [it had] already granted." *Id.*, Vol. 2, at 35. As a result, the court questioned Defendants "about what ha[d] already been done in this case" and why they needed an additional year's time to prepare. *Id.* For example, the court inquired as to whether Defendants had "devised a system where . . . [they were] not duplicating efforts," *id.* at 39, and confirmed that the government did not dispute the amount of time Defendants estimated they needed to review documents and prepare for trial, *see id.* at 41–42, and that the amount of time requested was consistent with what the government had "seen defense attorneys request and receive and use in order to work on preparing motions in a case like this," *id.* at 42.

The government also noted that having this additional time would ultimately promote efficiency, as there were "a number of witnesses" involved in the case, and being able to issue subpoenas "well in advance" would be helpful in ensuring the witnesses' availability. *Id.* at 44. In addition, the district court heard detailed arguments regarding the amount of discovery at issue, the need to retain computer experts, the need to coordinate with witnesses and counsel, and the difficulties faced by the defense in getting up to speed on an investigation that had been conducted over a period of several years.

Based on the "very well drafted joint motion" and the arguments presented at the status conference, the district court concluded that the ends of justice would

be served by granting the requested continuance. *Id.* at 44–45. The court then worked with the parties to establish a detailed schedule setting forth specific deadlines for upcoming motions and hearing dates. After setting a schedule and determining the amount of time needed by the parties to effectively prepare for trial, the court concluded:

> [T]he Court finds that for the reasons stated in detail in the joint motion, and for reasons further clarified here in this hearing, that the complexity of this case and the evidence and witnesses involved justify the Court making the legal conclusion that the ends of justice served by granting the joint motion outweigh the interest of the public and the defendants in a speedy trial.
>
> The failure to grant the joint motion would likely result in a miscarriage of justice by precluding the defendants from adequately being able to prepare for trial. And because of the number of the defendants and the nature of the prosecution, and the fact that this case involves an intricate 7 year financial conspiracy involving massive amounts of discovery, render this case so unusual and complex that it would be unreasonable to expect the defendants to prepare for trial in a shorter period of time and within the time limits set forth by the Speedy Trial Act and the Court's previous orders.

*Id.* at 54. Accordingly, the district court excluded 361 days from the speedy-trial calculations.

Based on the above, it is clear that the court properly weighed the factors set forth in 18 U.S.C. § 3161(h)(7)(B) and made sufficiently detailed findings to support granting an ends-of-justice continuance. Although the period of time granted was significant—and the district court noted its concerns with granting

25

such a lengthy continuance—the district court properly concluded that the exclusion of this time was warranted based on the complexity of the case and the extensive preparation required.

Defendants' assertions to the contrary are unpersuasive. For example, Defendants argue that the district court's ruling failed to comply with the requirements of *Toombs* or *Bloate v. United States*, 559 U.S. 196 (2010). However, Defendants support this argument with nothing more than conclusory assertions that the motion was granted in a "superficial fashion" and failed to include the "necessary analysis." Aplts.' Principal Br. at 36. These assertions are belied by the record, which establishes that the court fully questioned the parties regarding the need for a continuance and made detailed findings setting forth the reasons that an ends-of-justice continuance was warranted.

Similarly, Defendants' argument that the court was required to set forth its findings prior to ruling, and failed to do so, is unpersuasive. All that the Act requires is that the findings supporting an ends-of-justice continuance be made *contemporaneously* with the granting of the continuance. *See, e.g.*, *United States v. Gonzales*, 137 F.3d 1431, 1433 (10th Cir. 1998) (observing that "the [court's] balancing must occur contemporaneously with the granting of the continuance"); *accord United States v. Apperson*, 441 F.3d 1162, 1180 (10th Cir. 2006). That is exactly what occurred here. Specifically, the court questioned the parties regarding the need for a continuance, determined that a continuance was

26

warranted, established the amount of time that would be needed for motions and hearings, and then set forth its ruling along with detailed findings supporting the granting of the continuance. Accordingly, the court fully complied with the requirements for granting an ends-of-justice continuance, and the time was properly excluded for purposes of the Act.

    4.    <u>Continuance Granted on November 22, 2010</u>

Counsel for five of the six Defendants filed yet another motion for a continuance on November 18, 2010, seeking a 120-day continuance of the trial date. The motion was joined by five of the Defendants, and the sixth, Mr. Stewart, did not oppose it. In their motion, Defendants reiterated the breadth of discovery and noted pending brief-submission deadlines and the need for two defense counsel to take possibly two out-of-state trips, which would span approximately a week in duration, to interview witnesses. The motion also noted that the government's *James* proffer,[8] submitted October 28, 2010, listed 401 co-conspirator statements, and that other items "must be reviewed and considered in order to put many of the designated statements into context." R., Vol. 1, at 564 (Joint Mot. to Continue, filed Nov. 18, 2010). The motion further noted that "[c]ounsel . . . ha[d] been experiencing difficulties in finding and opening" some

---

    [8]    *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (establishing the rule that a trial court should not allow the jury to hear out-of-court co-conspirator declarations without first holding a hearing, outside the jury's presence, to determine whether such statements are admissible under Federal Rule of Evidence 801(d)(2)(E)).

27

of the computer discovery materials containing the statements at issue. *Id.* In addition, more documents had been disclosed to Defendants on November 8, 2010, and while the documents were not to be used by the government at trial, Defendants needed time to obtain, review, and analyze the documents for themselves.

During the *James* hearing on November 19, 2010, the district court also addressed Defendants' motion for a continuance and informed counsel that it would grant the continuance. On November 22, 2010, the district court issued an order to that effect stating:

> Due to the voluminous discovery, multiple defendants, and complex nature of the allegations in this matter, denying the requested continuance would result in a miscarriage of justice by denying Defendants an adequate opportunity to prepare for trial, despite the exercise of due diligence. Pursuant to 18 U.S.C. § 3161(h)(7)(A) and (B)(ii) and (iv), the ends of justice that will be served by continuing the January 31, 2011 trial date for the requested 120 days outweigh the best interests of the public and the Defendants in a speedy trial.

*Id.* at 571–72 (Order Granting Continuance, filed Nov. 22, 2010). The district court then rescheduled the final pretrial preparation conference and six-week jury trial accordingly.

The district court's November 22, 2010, order was somewhat less detailed than its prior orders; however, in setting forth its findings, a district court "need not articulate facts which are obvious and set forth in the motion for the continuance itself." *Toombs*, 574 F.3d at 1269 (internal quotation marks

28

omitted); *see United States v. Loughrin*, 710 F.3d 1111, 1119 (10th Cir. 2013) ("In determining whether the district court relied on sufficient facts in granting an ends-of-justice continuance, [this court] can look to the oral and written statements of both the district court and the moving party." (internal quotation marks omitted)), *aff'd*, --- U.S. ----, 134 S. Ct. 2384 (2014).  Here, Defendants' motion was extremely thorough and spanned numerous pages.  The motion set forth with specificity the reasons Defendants needed more time to address problems with discovery materials, supplemental briefing on suppression motions, and witness preparation.  Accordingly, even though the district court's ruling on this matter was less detailed than its prior orders, when considered in conjunction with the facts set forth in Defendants' motion, the order complied with the requirements for granting an ends-of-justice continuance, and the exclusion of an additional 120 days did not constitute an abuse of discretion.

## 2

Having determined that Defendants' statutory right to a speedy trial was not violated, we proceed to address whether Defendants' constitutional right to a speedy trial was violated.[9]  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  A defendant's constitutional speedy-trial right attaches when

---

[9]       "It is unusual to find a Sixth Amendment violation when the Speedy Trial Act has been satisfied."  *United States v. Abdush-Shakur*, 465 F.3d 458, 464–65 (10th Cir. 2006); *accord United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002).

29

he is arrested or indicted on federal charges, whichever come first.[10]  *See Larson*,

627 F.3d at 1207.  "To determine whether a defendant's Sixth Amendment right

has been violated, the court balances four factors: (1) the length of the delay; (2)

the reason for the delay; (3) the defendant's assertion of his speedy trial right; and

(4) whether the delay prejudiced the defendant."  *Id.*  "None of the factors is itself

necessary or sufficient to conclude that the Sixth Amendment speedy trial right

has been violated."  *Id.*  "Rather, they are related factors and must be considered

together with such other circumstances as may be relevant."  *United States v.*

*Kalady*, 941 F.2d 1090, 1095 (10th Cir. 1991) (quoting *Barker v. Wingo*, 407 U.S.

514, 533 (1972)) (internal quotation marks omitted).

    1.    <u>The Length of the Delay</u>

"[S]imply to trigger a speedy trial analysis, an accused must allege that the

interval between accusation and trial has crossed the threshold dividing ordinary

---

[10]    Prior to trial, Defendants moved to dismiss the indictment on grounds of "inexcusable pre-indictment delay," R., Vol. 1, at 119 (Joint Mot., filed May 5, 2010) (capitalization altered), and the district court denied their request in a motions hearing on July 9, 2010.  Defendants now purport to resurrect this issue in the context of their speedy-trial claims by noting: "Pre-[i]ndictment delay should be considered, as it impacted the continuous delays after indictment."  Banks's Opening Br. at 17.  However, they elaborate no further on this point such that it could fairly be considered "argument" under our precedent.  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (internal quotation marks omitted)); *accord Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 915 (10th Cir. 2012).  Thus, in light of Defendants' failure to develop any substantive pre-indictment-delay argument beyond this perfunctory reference, we consider the issue waived for purposes of appellate review and will not address it.

from 'presumptively prejudicial' delay." *United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010) (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)) (internal quotation marks omitted). "[I]f the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* (quoting *Doggett*, 505 U.S. at 652) (internal quotation marks omitted).

Here, the length of the delay was slightly over two years. "Generally, delays approaching one year are presumptively prejudicial." *Larson*, 627 F.3d at 1208. "The longer the delay, the more likely it is that the first factor will weigh in the defendant's favor." *Id.* However, in *Seltzer*, we observed that "even a two-year interval between charges and trial may not be deemed a 'delay' when the charges are complex." 595 F.3d at 1176.

Defendants argue that "the charges were not complicated as recognized by the Court and supported by the record," and that the delay was excessive given "the simplicity of the case." Banks's Opening Br. at 18. However, the record belies the accuracy of this statement. As set forth above, and as argued in Defendants' motions for continuances, the case involved thousands of pages of discovery and an investigation period that spanned approximately seven years. The case also involved multiple defendants and over one hundred potential witness interviews, and the district court's finding that the case was complex was

31

not clearly erroneous.

We note that whether this factor weighs in favor of Defendants is a close call. On the one hand, the case involved a significant amount of time-consuming discovery and multiple parties. However, a delay of over two years is "twice the time presumed to be ordinary." *Seltzer*, 595 F.3d at 1176. Ultimately, our sensitivity to the presumption of prejudice that attaches to delays greater than one year and our willingness to give Defendants the benefit of the doubt regarding the proper resolution of this close issue lead us to conclude that this factor weighs in favor of Defendants.

### 2. The Reason for the Delay

"The second factor, the reason for the delay, is especially important, and the burden is on the government to provide an acceptable rationale for the delay." *Larson*, 627 F.3d at 1208 (quoting *Seltzer*, 595 F.3d at 1177) (internal quotation marks omitted); *see also Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004) ("The Supreme Court places the burden on the state to provide an inculpable explanation for delays in speedy trial claims."). That being said, "[d]elays attributable to the defendant do not weigh against the government," and "[w]here the defendant's actions were the primary cause of the delay, the second factor weighs heavily against him." *Larson*, 627 F.3d at 1208 (citation omitted) (internal quotation marks omitted).

Here, the entirety of the delay is attributable to Defendants, who filed

32

multiple continuances with the district court and argued that they would be prejudiced if the court refused to grant them additional time to prepare. None of the continuances now challenged by Defendants were sought by the government. Accordingly, the "especially important" second factor weighs heavily against Defendants. *Cf. United States v. Batie*, 433 F.3d 1287, 1293 (10th Cir. 2006) ("Absent extraordinary circumstances, *Barker* counsels us not to find a violation of the right to a speedy trial when the defendant's actions indicate he had no desire for a speedy trial.").

3.      Defendants' Assertion of Their Right to a Speedy Trial

"The third factor, a defendant's assertion of his speedy trial right, is also given strong evidentiary weight." *Larson*, 627 F.3d at 1208. We have noted that "this factor weighs against a defendant who requests continuances and waits for months to assert his speedy trial right." *Id.*; *see also Toombs*, 574 F.3d at 1274–75 (holding that this factor weighed heavily against the defendant where many of the continuances were granted at the defendant's request and the defendant waited until after the continuances to assert his right to a speedy trial). Here, Defendants did not demand a speedy trial until the first day of the trial itself. Accordingly, given that Defendants waited until trial to assert their right to a speedy trial, after requesting *all* of the continuances, this factor also weighs heavily against them. *Accord United States v. Shepard*, 462 F.3d 847, 864 (8th Cir. 2006) (reaching the same conclusion and noting that, "[l]ooking to the third

33

factor, while [Defendant] did file a motion to dismiss based on a speedy trial violation, he waited until the first day of trial to do so").

    4.    <u>Whether the Delay Prejudiced Defendants</u>

Defendants bear the burden of showing that they were prejudiced by the delay. *See Larson*, 627 F.3d at 1208–09. However, "[i]n cases of extreme delay, the defendant may rely on the presumption of prejudice and need not present specific evidence of prejudice." *Id.* at 1209. "Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice." *Id.* (quoting *Seltzer*, 595 F.3d at 1180 n.3) (internal quotation marks omitted). Accordingly, this case does not present an instance of "extreme delay," and Defendants must present specific evidence of prejudice. *See Jackson*, 390 F.3d at 1264 (noting that "the mere 'possibility of prejudice is not sufficient to support [the] position that . . . speedy trial rights [are] violated'" (alterations in original) (omission in original) (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986))).

In determining whether a defendant has made "a particularized showing of prejudice," *Larson*, 627 F.3d at 1209, we have identified three main interests: "(i) the prevention of oppressive pretrial incarceration; (ii) the minimization of anxiety and concern of the accused; and (iii) minimization of the possibility that the defense will be impaired," *Seltzer*, 595 F.3d at 1179. We have held that the third interest—impairment of the defense—is the most important, and the first

34

interest—prevention of oppressive pretrial incarceration—is the second most important. *See Larson*, 627 F.3d at 1209.

Here, Defendants were not detained before trial, so the oppressive-pretrial-incarceration interest is of no assistance to them. Moreover, Defendants have not shown that their defense was impaired as a result of the delay. Rather, Defendants simply list record citations (without accompanying explanatory parentheticals) taking up over one-half of a page, which they claim support their contention that the delay worked to their detriment. *See* Banks's Opening Br. at 22–23. Defendants then make vague and conclusory assertions regarding "problem[s] with accurate memories" and their view that "cross-examination was hampered" because "Government witnesses [were] motivated to provide favorable testimony." *Id.* at 23. Defendants also claim that "[i]dentification and interviews of Government witnesses were delayed until the Indictment revealed witnesses involved in the case." *Id.* It is unclear how some of these allegations are even related to the delay in trial. To the extent they *are* related, however, Defendants have failed to make any specific allegations—such as which witnesses were affected by the delay and how this resulted in prejudice—that support their contentions. Accordingly, this factor weighs in favor of the government. *Cf. Castro v. Ward*, 138 F.3d 810, 820 (10th Cir. 1998) ("[D]espite [Defendant's] general allegation that the passage of time made it more difficult for him to present a defense, he points to no specific prejudice he claims he suffered from

35

the delay.  He has not claimed that *any specific witness or evidence* was somehow rendered unavailable or less persuasive because of the passage of time." (emphasis added)).

At best, Defendants have demonstrated only one factor, the first, that weighs in favor of finding a violation of their constitutional right to a speedy trial.  All other factors weigh against them.  Accordingly, the balancing of the four factors establishes that Defendants' Sixth Amendment right to a speedy trial was not violated.

**B**

We turn now to Defendants' argument that their Fifth and Sixth Amendment rights were violated as a result of the testimony of co-Defendant Barnes.  Specifically, Defendants argue that they were compelled to call co-Defendant Barnes as a witness in violation of their Fifth Amendment privilege against self-incrimination and that the district court failed to give a proper curative instruction to the jury following Mr. Barnes's testimony in violation of their Sixth Amendment right to a fair trial.

Whether a defendant's Fifth Amendment privilege against self-incrimination has been violated is a legal question we review de novo.  *See United States v. Rivas-Macias*, 537 F.3d 1271, 1276 (10th Cir. 2008).  In reviewing jury instructions for legal error, "we view them as a whole to determine whether the jury may have been misled, upholding the judgment in the absence of

substantial doubt that the jury was fairly guided." *United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999) (quoting *United States v. Wiktor*, 146 F.3d 815, 817 (10th Cir. 1998)) (internal quotation marks omitted). As with its decision whether to give a specific instruction at all, *see, e.g.*, *United States v. Haslip*, 160 F.3d 649, 654 (10th Cir. 1998) ("We review a district court's decision whether to give a particular jury instruction for abuse of discretion."); *accord Quigley v. Rosenthal*, 327 F.3d 1044, 1062 (10th Cir. 2003), ordinarily we review a trial court's decision regarding the timing of when to provide a specific curative instruction to the jury for an abuse of discretion, *cf. United States v. Moore*, 376 F.3d 570, 577 (6th Cir. 2004) ("A district court has broad discretion to supervise, control, and determine the issues the jury is to decide and the manner in which it is to do so."); *United States v. Zlatogur*, 271 F.3d 1025, 1030 (11th Cir. 2001) ("We review the district court's failure to provide additional jury instructions for abuse of discretion.").[11]

---

[11] Defendants argue that the alleged violations of their Fifth and Sixth Amendment rights constitute structural errors and, accordingly, are not subject to harmless-error analysis. As set forth *infra*, we ultimately conclude that the district court committed no error. However, even if the district court had erred, we would review for harmlessness. Harmless-error analysis applies to errors that "occurred during presentation of the case to the jury," and the effect of these errors "may be quantitatively assessed in the context of other evidence presented in order to determine whether [they] were] harmless beyond a reasonable doubt." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991)) (internal quotation marks omitted). In contrast, structural errors "defy analysis by harmless-error standards because they affec[t] the framework within which the trial proceeds, and are not simply an error in the trial process itself." *Id.* (alteration in

(continued...)

37

However, when a party fails to lodge an objection at trial to purported errors—be they instructional or otherwise—ordinarily he cannot "prevail unless he could successfully run the gauntlet created by our rigorous plain-error standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012); *see United States v. Rosales-Miranda*, --- F.3d ----, 2014 WL 3033419, at *3 (10th Cir. 2014) ("The parties also agree that [the defendant] failed to preserve an objection to that error. This forfeiture triggers plain-error review."); *Fabiano*, 169 F.3d at 1302 ("We review a jury instruction . . . for plain error when no objection was made."). It is axiomatic that

> [u]nder this demanding standard, [a litigant] must demonstrate: (1) an error, (2) that is plain, which means clear or obvious under

---

[11](...continued)
original) (quoting *Fulminante*, 499 U.S. at 309–10) (internal quotation marks omitted). The Supreme Court has explicitly held that errors relating to the admission of involuntary statements are subject to harmless-error analysis. *See Fulminante*, 499 U.S. at 310 ("It is evident from a comparison of the constitutional violations which we have held subject to harmless error, and those which we have held not, that involuntary statements . . . belong in the former category."); *id.* ("When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt."). Similarly, in *United States v. Lauder*, 409 F.3d 1254 (10th Cir. 2005)—the case Defendants primarily rely on in relation to their Fifth Amendment claim—we held that "[c]onstitutional violations such as the one at issue here are subject to . . . harmless error analysis . . . under which 'the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of [was harmless].'" *Id.* at 1261 (second and third alterations in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Accordingly, were we to conclude that the district court had erred with regard to the testimony of Mr. Barnes and any subsequent curative instruction (insofar as Defendants preserved a challenge to the error), we would review for harmlessness.

38

current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if [4] it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*McGehee*, 672 F.3d at 876 (third alteration in original) (quoting *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011)) (internal quotation marks omitted).

Furthermore, "[a] forfeiture implicating plain error review does not just occur when a litigant completely fails to object but also when he or she 'fail[s] to make the *timely* assertion of a right.'" *United States v. Wardell*, 591 F.3d 1279, 1309–10 (10th Cir. 2009) (second alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). In other words, a litigant must lodge an objection to a purported error while the district court still has an opportunity to fix it. *See Donley v. Christopher*, 320 F.2d 24, 26 (10th Cir. 1963) ("Having failed to object to the records at the time of their production and tender, the contention at this belated juncture comes too late."); *accord Macsenti v. Becker*, 237 F.3d 1223, 1230–31 (10th Cir. 2001) (considering the defendant's objection untimely and applying plain-error review when the defendant "did not object to the testimony when it was admitted during trial" but, rather, raised the objection "after the close of all the evidence by a motion"); *United States v. Walsh*, 75 F.3d 1, 6 (1st Cir. 1996) ("[B]oth objections are subject to review only for plain error. It is true that both issues were raised in the trial court *after* the verdict . . . . But

the usual rule is that an objection must be made known at the time that the court is making its decision to act . . . .").

We begin by briefly addressing the factual events leading up to Mr. Barnes's testimony. Then, we turn to Defendants' argument that Mr. Barnes was compelled to take the stand in violation of Defendants' Fifth Amendment privilege. Finally, we examine Defendants' argument that the district court failed to provide adequate curative instructions to the jury in violation of their Sixth Amendment right to a fair trial. Ultimately, we conclude that all of Defendants' arguments are unpersuasive.

**1**

On October 5, 2011, the government informed Defendants that it was ahead of schedule and would be resting its case on October 6, 2011. The district court informed Defendants at this time that they needed to have their witnesses ready and available to testify. *See* R., Vol. 2, at 2203–07. On October 7, 2011, the district court again admonished Defendants that they needed to have their witnesses available and ready to testify. *See id.* at 2473. Yet, on October 11, 2011, Defendants were still not prepared to present their defense, and they informed the district court during a sidebar that they were expecting to run out of witnesses for the day. The court informed Defendants that this was "unacceptable" and instructed them to call their next witness. Supp. R., Vol. 1, at

149–50 (Jury Trial Tr., dated Oct. 11, 2011).  Then, after conferring among themselves, and without interposing any objection, Defendants called co-Defendant Barnes to the stand.

The exchange, as captured by the court reporter, between the district court and co-Defendant Walker is as follows:

> The Court: Thank you . . . .  Defense may call its next witness.
>
> Mr. Walker: Your honor, the defense—can we approach?
>
> The Court: You may.
>
> (A bench conference [i.e., sidebar] is had, and the following is had outside the hearing of the jury.)
>
> Mr. Walker: Our next witness is scheduled at 10:30.  We anticipated—it's going quicker.
>
> The Court: That is unacceptable.  I told you to have witnesses here.  We are not going to recess again until 10:30.  That is 40 minutes away.  I told you to be prepared.  They need to be here.  Your witnesses are not taking long.  We are going to go.  The eight you named, you still have time.  So you better get them here.  So call your next witness.
>
> Mr. Walker: Yes, Your Honor.
>
> (The following is had in the hearing of the jury.)
>
> Mr. Walker: Your Honor, we would like to check to see if Mr. Reese is in the witness room.

The Court: You may.

Mr. Walker: Your Honor, defense calls Ken Barnes.

*Id.* at 149–50 (capitalization altered).

As the transcript reflects, the district court expressed its dissatisfaction in a bench conference (i.e., sidebar) with Defendants' failure to have their witnesses lined up to testify. However, the court "has acknowledged that a portion of the sidebar was not transcribed." *Id.* at 431 (Order Rejecting Proposed Stip., filed Oct. 16, 2012); *see* R., Vol. 1, at 1591 (noting that a "portion of the sidebar was not transcribed by the court reporter"). As the court has put it, "[f]or whatever reason, whether the parties spoke too far from the microphone or the court reporter took off her headphones, the court reporter did not hear everything that was said at the sidebar and therefore did not transcribe anything besides what is contained in the edited transcript."[12] Supp. R., Vol. 1, at 430.

---

[12] Defendants have repeatedly suggested that there is more to it than an inadvertent failure to transcribe a portion of the transcript. More specifically, they have asserted that the transcript that they received was incomplete; that the "missing transcript" holds the key to resolving the disagreement about what the district court said during the sidebar, Aplts.' Principal Br. at 49; and that the absence of the transcript "continues to compound the error, and must be resolved for truth to be found," *id.* at 52. The district court was perplexed by Defendants' repeated intimations to this effect, expressly noting that Defendants had received not only the final version of the transcript, but also the court reporter's underlying documentation, which would have permitted Defendants to discern whether a portion of the sidebar was omitted from the final version. In this regard, the district court stated the following:

(continued...)

42

> The Court is utterly confounded by the fact that Defendants continue to request an "unedited" transcript. Defendants were provided with an unedited transcript on Day 11 of trial[, i.e., the day of the sidebar at issue]. In addition, Defendants also have been provided with the edited transcript and access to the court reporter's original, unedited notes.

R., Vol. 1, at 1591 n.10; *see* Supp. R., Vol. 1, at 430 n.2 (noting that "[m]ultiple times, the Court has explained to Defendants that they have been provided with everything in the Court's possession"). Seemingly attempting to disabuse Defendants of the notion that there was some nefarious conduct responsible for the purported loss of a portion of the transcript relating to the sidebar, the court stressed more than once that, unfortunately, "the fact of the matter is that this portion of the sidebar conversation was not transcribed." Supp. R., Vol. 1, at 430 n.2; *accord* R., Vol. 1, at 1591 n.10 ("The fact of the matter is that the sidebar conversation was not transcribed and, thus, no transcript will reflect precisely what was said."). In the context of this litigation, Defendants have not given us any ground to conclude that the district court's finding regarding this matter was clearly erroneous. Indeed, by way of a Fed. R. App. P. 28(j) letter dated May 21, 2014, the government brought to our attention a significant development in separate civil litigation spawned by this disagreement over what the district court said during the sidebar that fortifies the accuracy of the court's finding. Specifically, A Just Cause, a nonprofit organization, brought suit in the United States District of Colorado against the court reporter who transcribed the trial proceedings in this case alleging, *inter alia*, a breach of contract. "The gist of the original Complaint was that the plaintiff had paid [the court reporter] $9,450 for a transcript of the trial, but [the court reporter] had not produced a complete transcript." *A Just Cause v. United States*, Dist. Ct. No. 1:13-cv-02260-RBJ, Doc. 39, at 9 (Order, filed May 9, 2014) (citation omitted) (footnote omitted). In the operative amended complaint, A Just Cause sued the United States and the court reporter; its "three remaining claims [were] for breach of contract, constitutional violation . . . , and negligence." *Id.* at 11. Ultimately, the district court dismissed all three claims in one order.

In the course of drafting that order, however, the court, extraordinarily (as well as commendably), "decided to investigate further, . . . by taking judicial notice of the records of the court," the question of the purportedly missing portion of the transcript. *Id.* The court noted that by carefully examining the court's records, including the court reporter's "unedited draft" of the final transcript, "it could . . . be determined definitively in the *Banks* case[, i.e., the instant case,] whether the court reporter altered something between when it was initially recorded and when it became final." *Id.* The court found no

(continued...)

43

Defendants and the court disagree on what was said in the untranscribed portion of the sidebar. Their disagreement persisted "[d]uring trial and in various post-trial motions." *Id.* Defendants contend that the court said words to this effect: "Put one of your witnesses on or one of the defendants will have to testify." *Id.* at 390 (Proposed Stip., filed Aug. 30, 2012) (internal quotation marks omitted). On the other hand, the court recalls saying, "[I]f you intended to testify, then one of you should take the stand, because we weren't going to continue." *Id.* at 430 (internal quotation marks omitted). It is undisputed, however, that at the time of the sidebar there was in fact a defense witness present in the courtroom under subpoena—specifically, FBI Special Agent John Smith—who was available to testify, *see* R., Vol. 1, at 1591–92; indeed, Defendants called Agent Smith to testify two days later.

---

[12](...continued)
evidence of such alteration; it noted that, indeed, A Just Cause did not aver that the court reporter "intentionally failed to record something that she heard" or "deleted anything from what she recorded." *Id.* at 12. Notably, the court concluded its findings on this matter by unequivocally stating that "there is no substantive difference between the unedited transcript and the final, official version . . . therefore, no 'missing transcript,' and nothing relevant to what occurred during the bench conference has been destroyed." *Id.* As with the district court's findings in the instant case regarding the purported missing transcript, Defendants offer us no reason to question that the district court's findings in the civil suit brought by A Just Cause are not clearly erroneous. Therefore, Defendants' argument that the purported missing transcript "continues to compound the error," Aplts.' Principal Br. at 52, in this case is wholly without merit; there is no reason to believe there is any such transcript. In any event, on appeal, Defendants cannot possibly sustain a tenable claim of prejudice, because we assume *arguendo* that their recollection of the district court's sidebar comments is correct. Even doing so, we conclude *infra* that they cannot prevail.

44

After Mr. Barnes took the stand, he was examined by co-Defendants Walker, Banks, and Harper. At no time did Mr. Barnes invoke his Fifth Amendment privilege against self-incrimination. Nor, during the course of his direct examination, did any Defendant object to the fact that Mr. Barnes was offering testimony or to the substance of that testimony. Indeed, the district court found that Mr. Barnes's direct testimony was "favorable" to Defendants. Supp. R., Vol. 1, at 238. However, shortly after the government began its cross-examination, co-Defendant Walker—who had originally called Mr. Barnes to the stand—moved for a mistrial, claiming that he was asserting Mr. Barnes's Fifth Amendment privilege against self-incrimination. The other Defendants did not object to Mr. Walker's invocation of Mr. Barnes's Fifth Amendment privilege or otherwise express concerns about it.

Following Mr. Walker's motion for a mistrial, the government requested that the court inform the jury that one defendant may not assert the Fifth Amendment privilege on behalf of another defendant and, therefore, that the jury should disregard Mr. Walker's statements. The district court stated that it would defer giving an instruction until it had ruled on the matter. The jury was then sent on a lunch recess while the district court considered the matter.

After considering the matter, and still outside the presence of the jury, the district court advised the parties that the Fifth Amendment privilege "is an individual one which can only be exercised by the defendant, himself." *Id.* at

45

228.[13]  The court then asked Mr. Barnes if he wanted to assert the privilege, and Mr. Barnes stated that he did.  The government then suggested that "the Court could instruct the jury that all of Mr. Barnes' testimony, both on direct and on cross, should be stricken; that the jury should not consider it, [and] they should put it out of their mind[]."  *Id.* at 231.  The government also suggested that the court provide a second curative instruction to address Mr. Walker's misguided attempt to invoke Mr. Barnes's Fifth Amendment privilege.  *See id.* at 231–32 (indicating that government counsel proposed "a very brief additional limiting instruction" that it considered "appropriate given Mr. Walker's inappropriate objection made in the presence of the jury prior to trial").

At this time, both Mr. Walker and Mr. Barnes began arguing to the court that Mr. Barnes had been forced to testify against his will and that this had caused "extreme prejudice" to all Defendants.[14]  *Id.* at 233 (Statement of Gary Walker);

---

[13]  *See In re Grand Jury Subpoenas*, 144 F.3d 653, 663 (10th Cir. 1998) ("There is no constitutional right not to be incriminated by the testimony of another . . . . The privilege against self-incrimination is solely for the benefit of the witness and is purely a personal privilege of the witness, not for the protection of other parties." (quoting *United States v. Skolek*, 474 F.2d 582, 584 (10th Cir. 1973)) (internal quotation marks omitted)); *see also Heinold Hog Market, Inc. v. McCoy*, 700 F.2d 611, 613 (10th Cir. 1983) ("The privilege against compulsory self-incrimination is limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records." (quoting *United States v. White*, 322 U.S. 694, 701 (1944)) (internal quotation marks omitted)).

[14]  Mr. Walker also continued to argue that his co-defendants' individual rights had been violated despite being informed repeatedly by the district court that he could not invoke the Fifth Amendment privilege on behalf of another.  *See, e.g.*, Supp. R., Vol. 1, at

(continued...)

46

*see id.* (Statement of Kendrick Barnes) ("I was compelled to take the stand from our discussion up at the bench, as we approached the bench."); *see also id.* at 232 ("The only reason I took the stand, Your Honor, was I was basically—when we approached, we were told [by the court] that someone needed to from us if we can't get our witnesses to testify, and that is the reason why I took the stand. It is on the premise that I had to. If we don't have a witness, one of us is going to have to take the stand. So I took the stand."). The district court repeatedly rejected these arguments and noted: "[Mr. Barnes] wasn't compelled. He got on the stand voluntarily. You asked him questions, he answered questions. This was not an issue that was raised until after he had finished giving all of his direct testimony."[15] *Id.* at 234; *see also id.* at 248 ("All the Court directed was that the defendants should call their next witness, at which time defendants called Mr. Barnes, and Mr. Barnes voluntarily took the stand.").

The district court then offered to strike Mr. Barnes's testimony and offer the curative instruction provided by the government. Mr. Barnes stated that he

---

[14](...continued)
233–34.

[15]     The district court also repeatedly asked Defendants how they were prejudiced by Mr. Barnes's testimony given that (1) they all decided to call Mr. Barnes to the stand; (2) no objections were made until after Defendants had elicited the favorable testimony from Mr. Barnes; and (3) the testimony concerned evidence that was already in the record. Defendants provided no coherent answers to these questions and simply continued to make the conclusory assertion that they were prejudiced because their rights were violated. *See* Supp. R., Vol. 1, at 234–46.

would finish his cross-examination and did not want a curative instruction regarding his testimony. *See id.* at 253 ("The Court: You do not want a curative instruction? Mr. Barnes: No, I don't want a curative." (capitalization altered)). The court then informed Mr. Barnes that he could not selectively invoke his Fifth Amendment privilege. Rather, because Mr. Barnes chose to testify and proceed with cross-examination, he had waived his Fifth Amendment privilege regarding any questions within the scope of his direct examination, and the government could permissibly "comment on [his] refusal to answer those questions" if he invoked his Fifth Amendment privilege on cross-examination. *Id.* at 255. Mr. Barnes then requested an additional twenty minutes to think over how he wished to proceed, which the court granted.

When the court reconvened, Mr. Barnes stated that he wanted to continue with cross-examination, and again stated that he did not want a curative instruction regarding his testimony. Before he testified, however, the court did provide the jury with a curative instruction relating to Mr. Walker's objection, along the lines proposed by the government, which stated, "Immediately before the break, there was an objection, and I just wish to remind you again that statements or objections made by attorneys or the defendants while not testifying are not evidence, and they should not be considered by you in any way." *Id.* at 258. In his subsequent testimony, Mr. Barnes did not offer any substantive responses to the government's questions on cross-examination; instead, as to each

48

question, he purported to invoke his Fifth Amendment privilege. *See, e.g.*, *id.* at

259 ("I will be asserting my Fifth Amendment privilege under the Constitution.").

## 2

We first turn to the question of whether the district court compelled Mr.

Barnes to take the witness stand and testify in violation of his Fifth Amendment

privilege.[16] Like the district court, for purposes of analyzing this question, we are

---

[16] Lest there be any confusion, although all Defendants claim that the district court erred and that they all have suffered resulting prejudice, we underscore that only Mr. Barnes's Fifth Amendment rights are at issue here. *See, e.g.*, *In re Grand Jury Subpoenas*, 144 F.3d at 663. It was only Mr. Barnes who took the stand. Defendants rely on *United States v. Sarracino*, 340 F.3d 1148 (10th Cir. 2003), in an attempt to establish that a co-defendant's testimony can be prejudicial to non-testifying defendants. *See* Banks's Opening Br. at 30. However, Defendants' reliance on *Sarracino* is unavailing. At issue in *Sarracino* was a co-defendant's *Sixth* Amendment right to confrontation, not a co-defendant's Fifth Amendment privilege against self-incrimination. *See* 340 F.3d at 1160–61. Specifically, in *Sarracino*, we were concerned with the rule articulated in *Bruton v. United States*, 391 U.S. 123 (1968), that the admission of a co-defendant's confession inculpating the defendant at a joint trial at which the co-defendant does not testify violates the defendant's Sixth Amendment right to confront witnesses against him. *See Sarracino*, 340 F.3d at 1159–61. It is patent from this recitation of its factual context that *Sarracino* is inapposite. Moreover, even in *Sarracino*, we noted that the *Bruton* rule "applies only in those few contexts where the statement is so inculpatory as to the defendant that the practical and human limitations of the jury system cannot be ignored." *Id.* at 1160 (quoting *United States v. Rahseparian*, 231 F.3d 1267, 1277 (10th Cir. 2000)) (internal quotation marks omitted); *see id.* ("[T]he *Bruton* rule does not apply to 'statements that are not directly inculpatory but only inferentially incriminating.'" (quoting *Rahseparian*, 231 F.3d at 1277)); *see also United States v. Shaw*, --- F.3d ----, 2014 WL 3377652, at *8 (10th Cir. 2014) (noting, *inter alia*, that a *Bruton*-type solution, such as redaction of a transcript, "is just a tool to remove, *in appropriate cases*, the prejudice to the defendant from allowing the jury to hear evidence admissible against the codefendant but inadmissible against the defendant" (emphasis added)). Given this understanding of the *Bruton* rule, even if the rule did apply here—which it does not—Defendants' argument would still fail because apparently nothing in Mr. Barnes's testimony was incriminating. As the district court stated, "It was not until Defendants had

(continued...)

prepared to "[assume] *arguendo* that Defendants' version of what was said at the sidebar conference is correct." R., Vol. 1, at 1591. However, even doing so, we join the district court in concluding that "Defendant Barnes was still not compelled to take the stand." *Id.* Accordingly, Mr. Barnes was not compelled to violate his Fifth Amendment rights.

Arguably, Defendants have forfeited any purported Fifth Amendment objection to Mr. Barnes's decision to testify and to his testimony during direct examination. Neither Mr. Barnes nor any of the other Defendants raised any objections regarding these matters; in particular, none of them even intimated that Mr. Barnes was being compelled to testify by the district court.[17] To be sure, when cross-examination commenced, they raised their compulsion-related objection. But, like the district court, we are hard-pressed to find that this

---

[16](...continued)
elicited as much favorable evidence as possible from Defendant Barnes that they raised any objection to his testifying." R., Vol. 1, at 1592. Defendants have not meaningfully contradicted—either before the district court or on appeal—the district court's finding that Mr. Barnes's testimony was favorable to the defense. Furthermore, the fact that the government advocated for completely striking Mr. Barnes's direct-examination testimony to address his post-direct-examination assertion of his Fifth Amendment privilege lends support to the view that there was nothing incriminating in this testimony. *See* Supp. R., Vol. 1, at 249 ("[W]hat the Government proposes in order to deal with that issue is to ask the Court to instruct the jury that the testimony of Mr. Barnes is being stricken in its entirety, and that they should not consider it as evidence in this trial in any way.").

[17]     The record reflects that the district court explicitly asked Mr. Banks, "Why did you not make an objection on that basis[, i.e., compulsion of Mr. Barnes to testify,] for the record?" Supp. R., Vol. 1, at 237. Mr. Banks's response—"[h]onestly, because we didn't feel it would do any good," *id.* at 238—hardly signals that he was in fact lodging a compulsion-related argument.

50

objection was anything but untimely with respect to Mr. Barnes's decision to testify and the direct-examination testimony that preceded the objection. Therefore, a cogent case could be made for the application of plain-error review to this objection. *See, e.g.*, *Wardell*, 591 F.3d at 1309–10; *Donley*, 320 F.2d at 26. However, because the government does not press for the application of the plain-error standard to this objection, *see McGehee*, 672 F.3d at 873 n.5 ("[A] colorable argument could be advanced that we should overlook [Defendant's] apparent failure to preserve his acceptance-of-responsibility argument because the government forfeited the right to object to it."), and because we conclude, even under the more searching de novo standard, *see Rivas-Macias*, 537 F.3d at 1276, that the district court did not compel Mr. Barnes to testify—and consequently did not commit the error of contravening Mr. Barnes's Fifth Amendment right not to testify—we need not definitively decide whether the plain-error standard should apply here.

Taking up our task, at the outset, we recall that under Defendants' view of the district court's sidebar comments, the court gave Defendants two alternative options for addressing the court's concerns about their timely presentation of witnesses. Specifically, according to Defendants, the court stated: "Put one of your witnesses on or one of the defendants will have to testify." Supp. R., Vol. 1, at 390 (internal quotation marks omitted). Notably, only one of the two options involved a Defendant, like Mr. Barnes, taking the witness stand. In other words,

Defendants could have fully complied with the district court's purported directive by offering for testimony a non-Defendant witness. It follows ineluctably that if Defendants had such a non-Defendant witness present and available to testify—such that they could have followed the district court's purported mandate by offering that witness—and if they elected instead to have one of their number take the witness stand, then that election by Defendants would have been voluntary. And that is precisely the situation here, as the district court succinctly described it:

> Left unmentioned by Defendants in their motions is the fact that FBI Special Agent John Smith was present in court and available to testify at all relevant times. Defendants had previously indicated that they would call Agent Smith to the stand, and they did so on Day 13 of trial. Defendants cannot argue in good faith that Defendant Barnes was compelled to take the stand when they could have called Agent Smith.

R., Vol. 1, at 1591–92.

In other words, because Defendants could have complied with the district court's purported directive by putting Agent Smith on the witness stand, then their decision instead to call co-Defendant Barnes cannot reasonably be viewed as a compelled response to the court's directive. To be sure, before the district court, "Defendants attempt[ed] to minimize the importance of Agent Smith's availability because they purportedly did not intend to call him at that point in trial," *id.* at 1592, telling the court that they were not prepared to present him "in a manner that would be advantageous" to them, Supp. R., Vol. 1, at 245. The

court, however, rejected Defendants' contentions in this regard.

The court immediately recognized that the tacit message of Defendants' arguments was that they had a choice to call Agent Smith or to call one of the Defendants (e.g., Mr. Barnes) to the stand, and they voluntarily—presumably for strategic reasons—chose the latter option. *Id.* (reflecting that the court responded to Defendants' argument that they were not prepared to call Agent Smith on Day 11 by stating, "So you made the decision who to call."). Furthermore, the court stressed its "considerable discretion in controlling the orderly presentation of evidence . . . in order to promote the efficient administration of the judicial process." R., Vol. 1, at 1592 (citing *Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir. 1987)). And it concluded that, "[g]iven Defendants' flouting of the Court's multiple directives to secure the presence of witnesses, the Court was well within its discretion in ordering Defendants to call a witness, rather than to take yet another recess." *Id.*

Defendants may well have abandoned on appeal their efforts to minimize the detrimental impact of Agent Smith's trial presence on their compulsion argument. They certainly do not reiterate their trial argument here in full form. At best, they insist that "it is not the role of the Government or the Court to dictate the manner in which a defendant should present his or her case-in-chief." Aplts.' Principal Br. at 49. However, even if Defendants have not abandoned the argument, we fully agree with the district court's explanation of why it lacks

53

merit. And, in particular, we reject Defendants' suggestion that the district court sought to "dictate" the manner in which they put on their case-in-chief; rather, the court simply exercised its considerable discretion to ensure that the jury's time was not wasted and that evidence was presented at trial efficiently, by ostensibly mandating that Defendants call *a* witness to the stand—not necessarily one of them. *See* Fed. R. Evid. 611(a)(2) (noting that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time"); *Thweatt*, 814 F.2d at 1470 ("A trial court necessarily possesses considerable discretion in determining the conduct of a trial, including the orderly presentation of evidence."); *accord Green Constr. Co. v. Kan. Power & Light Co.*, 1 F.3d 1005, 1013 (10th Cir. 1993); *see also United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("The scope of the district court's discretion to manage trials before it is and must be particularly broad. Accordingly, we have held, among other things, that district courts have wide-ranging control over management of their dockets, the courtroom procedures, and the admission of evidence.").

In sum, based on the foregoing, we conclude that Mr. Barnes was not compelled to take the witness stand and testify by the district court's purported sidebar comments. In other words, he testified voluntarily.

**3**

Because Mr. Barnes testified voluntarily, Defendants' Fifth Amendment

arguments are untenable. As the district court properly observed, by voluntarily testifying on direct examination, Mr. Barnes waived his right to invoke the Fifth Amendment on cross-examination. *See United States v. Constantine*, 263 F.3d 1122, 1128 n.4 (10th Cir. 2001) ("It is well established that a witness . . . may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." (quoting *Mitchell v. United States*, 526 U.S. 314, 321 (1999)) (internal quotation marks omitted)); *United States v. Crockett*, 435 F.3d 1305, 1313 (10th Cir. 2006) ("When an accused testifies in his own case-in-chief, he waives his privilege against self-incrimination, a waiver that subjects him to cross-examination on all relevant facts." (internal quotation marks omitted)). As the Supreme Court has explained, witnesses "may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Mitchell*, 526 U.S. at 322; *see also id.* ("The illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness.").

Defendants point to our holding in *United States v. Lauder*, 409 F.3d 1254, 1261 (10th Cir. 2005)—in which we used a five-factor test to determine whether a constitutional error occurs when a defendant chooses to invoke his or her Fifth Amendment right—and argue that the same five-factor test should be used here. In *Lauder*, we applied harmless-error analysis in reviewing the government's

comments regarding a defendant's silence and concluded that the resulting error was harmless beyond a reasonable doubt. *See id.* at 1261–62. In particular, we held that in determining whether comments regarding a defendant's silence were harmless, the court considers:

> (1) the use to which the prosecution puts the silence, (2) who elected to pursue the line of questioning, (3) the quantum of other evidence indicative of guilt, (4) the intensity and frequency of the reference, and (5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

*Id.* at 1261.

However, our holding in *Lauder* is inapposite. Specifically, in contrast to the situation presented here, the defendant in *Lauder* invoked his right to remain silent *before* trial. *See id.* at 1260. Then, during trial, a government agent impermissibly referenced the defendant's decision to remain silent. *See id.* at 1260–61. Here, Mr. Barnes voluntarily chose to take the stand, thereby *waiving* his Fifth Amendment privilege. Thus, no error occurred in this case and, consequently, *Lauder*'s harmless-error analysis has no purchase here.[18]

---

[18] Therefore, it cannot be gainsaid that, notwithstanding Defendants' assertions to the contrary, the government did not "bec[o]me the benefactor of the abuse of the [Fifth Amendment] privilege." Banks's Opening Br. at 31. Indeed, once the privilege has been waived, the government is within its rights to comment on a defendant's subsequent refusal to answer questions that are within the scope of the questions voluntarily given on direct examination. *See United States v. Hanrahan*, 508 F.3d 962, 967 (10th Cir. 2007) (holding that if a defendant chooses not to testify, the Fifth Amendment prohibits the government from commenting on that decision, but "[a] defendant who chooses to testify waives his privilege against compulsory self-

(continued...)

Defendants also argue that the district court applied the law inconsistently, and that this warrants reversal. *See* Banks's Opening Br. at 29–31. However, Defendants never clearly set forth what law is at issue—though one assumes they are referring to the general precepts of the Fifth Amendment—or how that law was applied inconsistently. *See id.* They appear to be asserting that the district court applied the law inconsistently because it first held that Mr. Barnes waived his Fifth Amendment privilege by taking the stand and testifying but then "changed its position and erred in permitting Barnes to retake the stand and repeatedly invoke the Fifth in response to the Government's further cross-examination." *Id.* at 28.

This argument is without merit. The district court did not inconsistently apply the law. Rather, it properly instructed Mr. Barnes that he could either have his entire testimony stricken (and a curative instruction given), or he could

---

[18](...continued)
incrimination with respect to the testimony he gives" (alteration in original) (quoting *Harrison v. United States*, 392 U.S. 219, 222 (1968)) (internal quotation marks omitted)). However, the government did not do this here. Specifically, the government did not comment on Mr. Barnes's invocation of his Fifth Amendment privilege during closing arguments and did not request that the jury be instructed that it could draw negative inferences from Mr. Barnes's belated invocation of his Fifth Amendment privilege. Rather, the only instruction given to the jury on this issue was as follows: "You should weigh Defendant Barnes' testimony and evaluate his credibility in the same way as that of any other witness. You may consider his refusal to answer certain questions in assessing his credibility." R., Vol. 1, at 825 (Final Jury Instrs., filed Oct. 20, 2011). Thus, if anything, the government showed restraint in its handling of Mr. Barnes's refusal to answer questions on cross-examination, after having waived his Fifth Amendment privilege, and hardly sought to exploit the situation that Defendants themselves created.

57

continue to testify but, if he did so, he would be required to answer the government's questions—to the extent they were within the scope of direct—and, if he chose not to answer, the government would be within its rights to comment on that silence. The district court's approach involved a proper application of Fifth Amendment principles to the instant facts. And it involved no inconsistency. It was Mr. Barnes who chose to continue testifying, even after the district court admonished him that he would be legally obliged to answer the government's questions. And it was Mr. Barnes who elected to invoke the Fifth Amendment and remain silent when ultimately confronted with the government's questions, though fully aware, based on the court's warnings, that he had waived his Fifth Amendment privilege. In short, the district court did not apply the law inconsistently, and there is no ground for reversal on that score.

**4**

Finally, Defendants allege that the curative instructions given by the district court were insufficient and that this violated their Sixth Amendment right to a fair trial. The district court considered two separate curative instructions. The first concerned Mr. Barnes's testimony on direct examination and his decision to invoke his Fifth Amendment privilege during cross-examination. This instruction would have informed the jury that Mr. Barnes's testimony during direct examination was being stricken and was not to be considered by the jury. The second proposed curative instruction concerned Mr. Walker's attempt to

58

invoke Mr. Barnes's Fifth Amendment rights and his motion for a mistrial.

The district court repeatedly offered to give the first curative instruction; however, Mr. Barnes twice refused the instruction and chose instead to continue his testimony on cross-examination. Defendants now argue that the failure to give the first instruction was error. This argument is without merit. Because Defendants explicitly and intentionally instructed the court not to give the instruction, any error was invited, and they have waived their right to challenge this issue on appeal. *See United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012) (noting in the context of a jury instruction that "[a] waived claim or defense is one that a party has knowingly and intelligently relinquished" (quoting *Wood v. Milyard*, --- U.S. ----, 132 S. Ct. 1826, 1832 n.4 (2012)) (internal quotation marks omitted)); *see also id.* (noting that "a party that has *waived* a right is *not* entitled to appellate relief" (quoting *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009)) (internal quotation marks omitted)).

As for the second curative instruction relating to Mr. Walker's purported invocation of Mr. Barnes's Fifth Amendment rights, Defendants allege that the instruction was "cursory and wholly insufficient," Aplts.' Principal Br. at 47, and, by not instructing the jury immediately—that is, by delaying issuance of the curative instruction until after the jury took a lunch recess—the court "disregard[ed] its duty to minimize the obvious prejudice to the jury, so as to maintain as much of its impartiality as possible," *id.*; *see also id.* at 50 ("[T]he

59

Court declined to instruct the jury within the immediate aftermath of the injurious episode [of Mr. Walker's Fifth Amendment objection], other than directing the panel to take lunch recess. This is wholly insufficient." (citation omitted)). However, Defendants' challenge based on these allegations is presented for the first time on appeal; in other words, Defendants lodged no contemporaneous objections relating to either the substance or the timing of the Walker-related curative instruction.

Accordingly, we review this challenge only for plain error. *See, e.g.*, *Fabiano*, 169 F.3d at 1302. Contrary to Defendants' suggestion, it is only in the face of clear or obvious error that would work a manifest injustice—which is the kind of error addressed by the plain-error standard, *see, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[W]e will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result."); *id.* at 1129 (discussing "applying the plain error/manifest injustice standard to newly raised legal theories")—that the court has a duty to take corrective action "regardless of whether it was affirmatively requested . . . by any party," Aplts.' Principal Br. at 50–51.

We conclude that Defendants cannot even establish the first prong of the plain-error standard—*viz.*, they cannot establish that the district court erred at all. Here, the court's instruction was straightforward and provided a correct statement

of the law: it properly instructed the jury that statements or objections made by a defendant while not testifying (i.e., Mr. Walker) were not evidence. Defendants have offered us no legal authority to substantiate their conclusory assertion that this instruction was (as a matter of law) "wholly insufficient," Aplts.' Principal Br. at 47, and we conclude that the jury was not misled regarding the governing law. Nor have Defendants directed us to anything in the record to bolster their equally conclusory—as well as speculative—suggestion that the court's brief delay in providing the instruction (i.e., until after the lunch break) constituted an abuse of discretion and prejudiced them because it gave the jury "ample time to refine [its] deleterious interpretations," *id.* at 50, of Mr. Walker's objection. Jurors are presumed to follow a trial court's instructions. *See, e.g.*, *United States v. Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000) ("Generally, we assume that jurors follow the judge's instructions."). And we have no reason to believe that the relatively brief lunch recess would have led these jurors to disregard the court's curative instruction regarding Mr. Walker's objection and to instead act on any contrary impressions (deleterious or otherwise) that they had formed of his objection. Accordingly, like the legal substance of the jury instruction, we discern no error in the timing of the district court's delivery of the instruction. In other words, the district court did not commit error, much less clear or obvious (i.e., plain) error.

61

## C

We turn now to Defendants' claim that the district court abused its discretion in excluding two of Defendants' proposed witnesses, Andrew Albarelle and Kellie Baucom. We review the district court's decision to exclude both expert and lay witness testimony as a sanction for violation of Federal Rule of Criminal Procedure 16 for abuse of discretion. *See United States v. Wicker*, 848 F.2d 1059, 1060–61 (10th Cir. 1988). "We review de novo whether the district court employed the proper legal standard and performed its gatekeeper role in determining whether to admit or exclude expert testimony," and "[w]e review for abuse of discretion the manner in which the district court performs this gatekeeping role." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (internal quotation marks omitted). Assuming that the district court performs this role, "[our] review is deferential: we will not disturb the ruling unless it is arbitrary, capricious, whimsical or manifestly unreasonable, or we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted).

Defendants argue that Mr. Albarelle and Ms. Baucom should have been permitted to testify as expert witnesses, or alternatively, that the witnesses should have been permitted to testify as fact witnesses. The district court disallowed the testimony of both witnesses on the grounds that Defendants failed to disclose the

witnesses in accordance with Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702. Although Defendants concede that they failed to comply with the disclosure requirements of Rules 16 and 702, they nevertheless argue that "the record reflects that their efforts were made in good faith, and the Court's chosen remedy of exclusion was in contravention to established precedent." Aplts.' Principal Br. at 56.

We begin by addressing the events leading up to the exclusion of Defendants' witnesses. We then address the district court's decision to exclude Defendants' witnesses as a sanction for failing to comply with Federal Rule of Criminal Procedure 16's disclosure requirements and also with Federal Rule of Evidence 702. We then turn to Defendants' alternative argument that Mr. Albarelle and Ms. Baucom should have been allowed to testify as fact witnesses. Finally, we address Defendants' argument that their Sixth Amendment rights were violated by the district court's exclusion of the witness testimony.

**1**

On October 8, 2010, Defendants filed an expert disclosure in accordance with the requirements of Federal Rule of Criminal Procedure 16. The disclosure contained a summary of the opinions to be offered by Donald Vilfer, but included no other proposed expert witnesses. During a pretrial conference regarding the admissibility of Mr. Vilfer's testimony, Defendants again failed to provide disclosures regarding any other potential expert witnesses. During opening

statements to the jury, Defendants made references to the fact that they would be calling expert witnesses to testify regarding business practices in the staffing industry. The government then informed the district court that it had not received disclosures of expert testimony relating to these topics and noted that it would object to the introduction of such testimony. At the close of its case-in-chief, the government again put Defendants and the court on notice that it would object to any expert testimony that had not been disclosed in accordance with Rule 16. "[D]efendants failed to respond in any way to the Government's objection or to inform the Court that this was an issue that needed to be addressed before the trial began." R., Vol. 2, at 2342.

Defendants called Mr. Albarelle as their first witness and stated that they were "going to establish [him] as an expert." *Id.* at 2288 (Jury Trial Tr., dated Oct. 6, 2011). When the court questioned Defendants regarding whether they had made a Rule 16 disclosure or submitted a Rule 702 opinion, Defendants responded: "Your Honor, we were informed we could qualify him on the stand." *Id.* However, Defendants were "unable or unwilling to disclose the identity of this legal advice." *Id.* at 2342. Defendants then argued that a letter sent by Mr. Albarelle to the United States Attorney's Office satisfied Rule 16's disclosure requirements.[19] The court rejected this argument. Defendants then proposed that

---

[19] The contents of the letters written by Mr. Albarelle and Ms. Baucom are discussed in greater detail in Part II.C.2, *infra*.

Mr. Albarelle and another potential expert witness, Ms. Baucom, could testify as lay witnesses. The court rejected this argument as well, noting that the type of testimony Defendants wanted to introduce through these individuals constituted expert testimony.

Although the court initially ruled that Defendants could not offer testimony from Mr. Albarelle, Ms. Baucom, or a third witness, Joseph Thurman, it later revised its ruling to allow testimony from Mr. Thurman. In so ruling, the court acknowledged that the "exclusion of evidence for violating discovery orders should not be done lightly," *id.* at 2341, but held that the sanction was warranted under these circumstances where Defendants had "not offered any legitimate reasons for failing to submit their Rule 16 disclosures as to these two witnesses," *id.*[20]

While the court held that the testimony of Mr. Albarelle and Ms. Baucom was inadmissible, it concluded that the government had received some notice that Mr. Thurman would be called[21]—though it noted that the disclosure regarding Mr.

---

[20] While the court acknowledged that Defendants were proceeding pro se, it noted that Defendants had "repeatedly rejected [the] Court's offer to appoint stand-by advisory counsel." R., Vol. 2, at 2341. Moreover, "[D]efendants were also aware that they would be required to follow the same procedural rules that govern other litigants . . . [and] knew, or should have known, that they were expected to submit Rule 16 disclosures." *Id.*

[21] A few months prior to trial, Defendants had submitted to the government a stack of materials that included a document prepared by Mr. Thurman entitled "Expert Report on Staffing Industry Standards and Best Practices." R., Vol. 2, at 2344 (internal

(continued...)

65

Thurman was inadequate—and thus allowed Mr. Thurman to provide expert testimony regarding the staffing industry.  In light of its decision to allow Mr. Thurman to testify, the court also noted that any testimony offered by Mr. Albarelle and Ms. Baucom would have been cumulative.

**2**

In light of the foregoing facts, we conclude that the district court did not abuse its discretion in excluding the testimony of Mr. Albarelle and Ms. Baucom due to Defendants' failure to comply with Rule 16's disclosure requirements. Specifically, Rule 16 of the Federal Rules of Criminal Procedure provides that "[t]he defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rule[] 702 . . . of the Federal Rules of Evidence as evidence at trial."  Fed. R. Crim. P. 16(b)(1)(C).  "If a party fails to comply with this rule, the court may . . . prohibit that party from introducing the undisclosed evidence; or . . . enter any other order that is just under the circumstances."  *Id.* §§ 16(d)(2)(C), (D).

In *United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988), we set forth three factors that the district court should consider in determining the appropriate sanction for a Rule 16 violation: (1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party

---

[21](...continued) quotation marks omitted).

that sought the disclosure; and (3) "the feasibility of curing the prejudice with a continuance." *Id.* at 1061. We also noted that "these three factors should merely guide the district court in its consideration of sanctions; they are not intended to dictate the bounds of the court's discretion." *Id.* Thus, for example, it may be appropriate for a district court "to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the [party entitled to the disclosure] may not be prejudiced." *Id.*

Here, the *Wicker* factors all support the district court's decision to exclude Defendants' witnesses. As the court noted, Defendants offered no legitimate reasons for their failure to comply with Rule 16's disclosure requirements. Moreover, the government would have been prejudiced if Defendants had been allowed to call expert witnesses on the ninth day of trial—*viz.*, the government would have been hobbled in its ability to prepare an effective cross-examination challenging the experts' qualifications and conclusions. *See United States v. Russell*, 109 F.3d 1503, 1512 (10th Cir. 1997)[22] (White, J., sitting by designation) (concluding that there was "no doubt that the prosecution would have been prejudiced" had new witnesses been allowed to testify on the same day the government received notice of the witnesses, as "the government would need time to research the background of the . . . witnesses in order to cross-examine them in

---

[22] Although *Russell* was not a Rule 16 case, we noted in *Russell* that cases involving Rule 16 provide a "satisfactory precedent to deal with violations of orders requiring pretrial disclosure of witnesses." 109 F.3d at 1511.

an effective manner").

Finally, with regard to the third *Wicker* factor, it was not an abuse of discretion for the district court to refuse a continuance given that it was the ninth day of trial and the government had already rested its case. *See Russell*, 109 F.3d at 1512 (finding that the district court did not abuse its discretion in refusing a continuance, "even in the absence of bad faith," where the new witnesses were disclosed on the fifth day of trial).

As we noted in *Russell*, the "admonition that the trial court must impose the least severe sanction that will accomplish . . . prompt and full compliance with the court's discovery orders does not mean that a continuance is necessary just because it will cure the prejudice." *Id.* (omission in original) (citation omitted) (quoting *Wicker*, 848 F.2d at 1060) (internal quotation marks omitted); *cf. Taylor v. Illinois*, 484 U.S. 400, 413 (1988) (holding that the exclusion of a defense witness in a case suggesting bad faith and willfulness on the part of the defense did not offend the Sixth Amendment, even when less drastic sanctions were available). Accordingly, under the three factors set forth in *Wicker*, it was not an abuse of discretion for the district court to exclude the testimony of Mr. Albarelle and Ms. Baucom based on Defendants' failure to comply with Rule 16's disclosure requirements.

**3**

We further conclude that Defendants failed to establish that Mr. Albarelle's

and Ms. Baucom's proposed testimony was admissible under Federal Rule of Evidence 702, and this provides an additional basis for refusing to allow the proposed testimony. "Under Rule 702, the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Nacchio*, 555 F.3d at 1241 (internal quotation marks omitted). Specifically, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *Nacchio*, 555 F.3d at 1241. Here, Defendants failed to establish that the proposed testimony of Mr. Albarelle and Ms. Baucom was either reliable or relevant. The only items in the record from Defendants for the court to use in conducting its admissibility inquiry were two letters—one written by Mr. Albarelle and the other written by Ms. Baucom—that were mailed to John Walsh, the United States Attorney for the District of Colorado.

The letters sent by Mr. Albarelle and Ms. Baucom to Mr. Walsh failed to

set forth any facts or data that would establish the reliability of the proposed testimony.[23] Accordingly, the district court properly performed its gatekeeping function in concluding that the letters failed to establish that any opinions to be offered by the witnesses were "based on facts which [would] satisfy Rule 702's reliability requirements." *Id.* (internal quotation marks omitted). It therefore inexorably follows that it was not an abuse of discretion for the court to rule that the testimony should be excluded.

We also reject Defendants' alternative argument that Mr. Albarelle and Ms. Baucom should have been permitted to testify as fact witnesses. "A district court has broad discretion to determine whether a lay witness is qualified under Rule 701 to testify on a matter of opinion." *United States v. Garcia*, 994 F.2d 1499, 1506 (10th Cir. 1993) (internal quotation marks omitted). Rule 701 of the Federal Rules of Evidence provides that opinions by lay witnesses must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on

---

[23] The letters written by Mr. Albarelle and Ms. Baucom can best be characterized as letters of support on behalf of Defendants. For example, the letter written by Mr. Albarelle set forth Mr. Albarelle's belief that Defendants had not engaged in criminal wrongdoing. *See* R., Vol. 1, at 1273–74 (Albarelle Letter, dated July 18, 2011). The letter gave no indication that Mr. Albarelle would be called as a witness by Defendants and concluded with a request that "this case be dismissed without prejudice." *Id.* at 1274. The letter written by Ms. Baucom similarly gave no indication that Ms. Baucom sought to testify, but rather, stated her belief that she "was shocked at the allegations" and that she "firmly believe[d] [Defendants] were not trying to pull off a scam." *Id.* at 1271 (Baucom Letter, dated July 20, 2010).

scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Here, Defendants informed the court that the witnesses would "[t]alk about the staffing industry . . . how companies engage staffing companies, how staffing companies interact with contractors and employees, as well as 1099 contractors for staffing companies." R., Vol. 2, at 2292. The district court properly concluded that this would amount to expert testimony. *See id.* at 2293. Specifically, the court's conclusion was sound because Defendants failed to establish that Mr. Albarelle or Ms. Baucom had personal knowledge of the facts which formed the basis of their opinions as required by Rules 701 and 602.[24] *See Garcia*, 994 F.2d at 1506 ("[T]he witness must have 'first hand knowledge' of the events to which he is testifying." (quoting *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985))). Given the failure of Defendants to establish that the witnesses had personal knowledge of Defendants' businesses or the facts in issue, the district court properly concluded that the witnesses could not testify as fact witnesses because their testimony was expert in nature.

**4**

Finally, Defendants argue that their Sixth Amendment right to present a complete defense was violated because they should have had the opportunity to

---

[24]     Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

present "witness testimony that impeaches material Government witness testimony." Banks's Opening Br. at 43. Accordingly, they argue that Mr. Albarelle and Ms. Baucom "should have been allowed to testify how they work with start up companies, how they bill, and what is allowable billing in their operations." *Id.* at 43–44. This argument is wholly unpersuasive.

Specifically, Defendants had a full opportunity to confront and cross-examine the government's witnesses. Moreover, Defendants were given the opportunity to present a comprehensive defense. In fact, despite their failure to comply with Rule 16's disclosure requirements, the court allowed Defendants to present testimony from Mr. Thurman, who testified concerning the relationship between staffing companies and clients, payrolling, and how staffing companies are compensated. *See* R., Vol. 2, at 2618–903. Defendants therefore had an ample opportunity to present testimony regarding staffing companies and their billing operations, and this "meaningful opportunity to present a complete defense" easily satisfies the Sixth Amendment. *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012) (internal quotation marks omitted). The district court was also within its rights to conclude that any testimony from Mr. Albarelle and Ms. Baucom would have been cumulative, not to mention subject to exclusion under Rules 16 and 702. *See id.* at 1096 (observing a district court's broad discretion in imposing "reasonable limits on cross-examination based on concerns about . . . prejudice, confusion of the issues, . . . or interrogation that is

72

repetitive" (omissions in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (internal quotation marks omitted)).

Accordingly, Defendants have failed to establish that the district court abused its discretion in preventing Mr. Albarelle and Ms. Baucom from testifying for the defense.

**D**

Defendants' final argument is that, taken together, the errors they have alleged deprived them of a fair trial and led to their conviction. In analyzing such a claim, "we aggregate all the errors that we have found to be harmless and determine 'whether their cumulative effect on the outcome of the trial' mandates reversal." *United States v. Anaya*, 727 F.3d 1043, 1060–61 (10th Cir. 2013) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc)). Stated otherwise, we ask whether a defendant has demonstrated that "multiple non-reversible errors" infected his trial. *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007).

Here, Defendants' failure to establish *any* error—harmless or otherwise—makes the cumulative-error doctrine unavailable to them. *See United States v. Lopez-Medina*, 596 F.3d 716, 741 (10th Cir. 2010) (concluding that a similarly situated defendant "cannot benefit from the cumulative error doctrine" (internal quotation marks omitted)). It is well-settled that a cumulative-error inquiry is warranted "only if true errors occurred." *Anaya*, 727 F.3d at 1061. By

contrast, "[c]umulative error cannot be predicated on non-errors," *United States v. Oldbear*, 568 F.3d 814, 825 (10th Cir. 2009), or on invited error, *see Lopez-Medina*, 596 F.3d at 733 n.10, 741; *United States v. Vizinaiz*, 428 F.3d 1300, 1310–12 (10th Cir. 2005). We thus reject Defendants' cumulative-error argument because we find no error among the appealed issues and, as a result, have nothing to aggregate.

## III

For the foregoing reasons, we **AFFIRM** the judgment of the district court.[25]

---

[25] On February 17, 2014, Defendants filed in this court a motion to strike an order entered by the district court which placed certain docket entries under seal. Specifically, the motion contended that the district court lacked jurisdiction to enter the order because the case was on appeal. Because we affirm in full the judgment of the district court, we **DENY** this motion as moot.